## Umberger Estate.

588

Argued January 10, 1952. Before DREW, C. J., STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

*Christian R. Gingrich,* for appellants.

*L. E. Meyer,* with him *Meyer, Brubaker & Whitman,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 27, 1952:

On October 14, 1947, Carrie S. Umberger, being then 62 years of age, made out her will, paragraph 4 of which reads: "I give my double house and lot of ground with appurtenance thereunto belonging situate at numbers 208 and 210 West Sheridan Avenue, Annville, Penna.

to whoever takes care of me in my last illness or old age at the discretion of the executor."

She was at this time in reasonably good health and, with the exception of a nervous condition following an operation she had undergone several years previously, carried on the normal routine of a widow living alone. She was able to travel without assistance and walked about the town unaided in any way. On the morning of June 3, 1948, she rose and began the day without incident. In the afternoon she entertained company at her home and then accompanied her departing guests to the bus station. Returning home she prepared her supper and ate it. In the early evening she experienced some pains in her chest and summoned her doctor who administered a hypodermic injection. In accordance with her wish he then endeavored to reach her cousin, Harry M. Walmer, but failing in this he telephoned a certain Mrs. Margaret Zimmerman, also at Mrs. Umberger's request. Mrs. Zimmerman replied that she was engaged at the moment, but would come as soon as she could. At 9 p.m. she arrived, accompanied by a Mrs. Lizzie Fidler. The doctor then left, first telling the women to call him in the event it should become necessary. The two visitors gave Mrs. Umberger her medicine and made her comfortable in accordance with instructions received from the doctor. At 4 a.m. Mrs. Umberger died, the cause of death being acute heart attack.

For the services thus rendered that night, Mrs. Zimmerman and Mrs. Fidler demanded the double house at 208-210 West Sheridan Avenue, Annville, Pennsylvania, asserting that they took care of Mrs. Umberger in her last illness or old age, as stipulated in the will.

The executor of the will, Harry M. Walmer, cousin to the deceased, rejected the demand of the two women on the ground that he had been invested by Mrs.

Umberger's will with a discretion, in the exercise of which he believed that the offices of the two claimants did not measure up to what was required in order to be awarded the real estate in dispute.

Mrs. Zimmerman and Mrs. Fidler, accompanied by a policeman and energetic counsel, proceeded to the premises and took possession thereof.

As the executor refused to give the claimants any documentation of ownership to the property they had seized, the latter instituted proceedings for a declaratory judgment to obtain title to the premises. The Orphans' Court of Lebanon County, after hearing, upheld the executor, and the claimants have appealed to this Court.

Did the seven hours' vigil by the two women at the bedside of Mrs. Umberger on the night of June 3, 1948, entitle them to the property outlined in her will? In order for the claimants to gain an affirmative answer to that question they must prove that Mrs. Umberger died of old age or of a "last illness". And in construing a will, all of the surrounding circumstances must be considered: *Nicholson Estate,* 355 Pa. 426, 431, 50 A. 2d 283; *Morrison Will,* 361 Pa. 419, 421, 65 A. 2d 384; *Shober Estate,* 364 Pa. 321, 324, 72 A. 2d 113.

The claimants can scarcely prove their case on the proposition that Mrs. Umberger died of old age. Old age does not descend on one overnight. Old age is not a trauma, nor is it a disease. It is simply a period of life as infancy, youthhood or middle age is a period of life.

The term "old age" does not today mean what it did centuries and even decades ago. At one time it was almost synonomous with helplessness or even senility, but old age in this midway era of the twentieth century has no significance other than chronology, unless it is coupled up with the adjective "helpless". But a chasm

of vast proportions separates "helpless old age" from simply "old age". General Douglass MacArthur is 72 years old but no one thinks of him as an old, aged man. Winston Churchill has seen 77 years of adventure and crises in the fields of politics, literature, war and statesmanship, and at this moment heads the great British Empire. Mrs. Franklin D. Roosevelt is 67 years of age and still circles the globe with the ease of a young woman tourist. Men and women less celebrated in worldly affairs still regard 64, the age at which Mrs. Umberger died, as an age of health, activity and enjoyment.

In any event, when old age comes it does not overwhelm one in the space of seven hours. We accordingly decide that the claimants cannot hold the double house on the supposition that they took care of Mrs. Umberger during her "old age".

It appears that for a year or so prior to Mrs. Umberger's death, Mrs. Zimmerman visited the home of the decedent about once a week to do house cleaning and clothes washing for her. This service is also advanced in part fulfillment of the condition prescribed in the will.

The record would indicate that Mrs. Umberger was a person of intelligence and discernment. With her own hand she wrote the will which is the subject of this litigation and, excepting two or three misspelled words, any lawyer could have been well satisfied with the direction and craftsmanship which went into its drafting. There is no reason to suppose that if Mrs. Umberger wanted to install Mrs. Zimmerman in the double house on West Sheridan Avenue in payment for the washing which she did and was still to do, she could not have said so in the will. In fact, she did bequeath to Mrs. Zimmerman, in article D of the will, the sum of $300. Since Mrs. Zimmerman was not a relative, it is

not too much to assume that Mrs. Umberger was compensating her by this bequest for the household work which she rendered the testatrix.

Mrs. Zimmerman testified that Mrs. Umberger occasionally gave her a dollar in payment of gas, although we cannot credit with too much forthrightness the statement of Mrs. Zimmerman that in the period of a year Mrs. Umberger gave her only $3.00 for gas.

Mrs. Lizzie Fidler testified that she accompanied Mrs. Zimmerman to the Umberger home and helped with the housecleaning. It does not appear that her exertions consisted of more than a casual helping hand rendered in the spirit of good neighborliness.

If the claimants are to prevail in this case, they must establish that what happened to Mrs. Umberger the night of June 3, 1948, was a "last illness". Literally, of course, it *was* a last illness, but in the interpretation of wills we must take words as they are generally used in context and not in lexicographical isolation. The fatal pneumonia which follows a shattering chest injury is the last illness of the victim, but his death is attributed not to disease but to accident.

Last illness generally means, and in a will it invariably specifically means, a lingering or protracted illness. The natural apprehension of the reflective man, as he contemplates the last mile, that he may be overpowered by a malady which will render him helpless, causes him to make some provision for that contingency. And the conscientious person, with the means to do so, will also provide for compensation to the individual who will care for him or her during that invaliding last illness. And that is what Mrs. Umberger did.

An acute heart attack cannot be considered a last illness in the sense that phrase was used in Mrs. Umberger's will. In the interpretation of wills, the law will impute to a testator's words such meaning as under

all the circumstances will conform to his probable intention and be most agreeable to reason and justice. *Jackson's Estate*, 337 Pa. 561, 565, 12 A. 2d 338; *Shober Estate*, 364 Pa. 321, 324, 72 A. 2d 113; *Clark Estate*, 359 Pa. 411, 419, 59 A. 2d 109.

Although Mrs. Umberger had a nervous condition, as previously stated, she did not have heart disease. Her doctor testified that he never treated her for any heart condition. The seizure which caused her death on June 4, 1948, therefore, was as sudden and unexpected, as a severe fall. If "last illness" is to be taken literally, then every one dies of a heart attack, because it is the ultimate ceasing of the heart beat which stills forever the throb of life. But a heart attack is a definite hurt to the heart itself, uninfluenced by injury or disease affecting other parts of the body.

While it is impossible to know what was in Mrs. Umberger's mind when she wrote the words "last illness", common sense and the simplest logic rationally exclude the idea that she was preparing to donate a double house to anyone who would care for her for seven hours. She knew that there were enough funds in her estate to discharge all obligations arising out of a mortal accident. The whole pattern of her life, her economic status, and her mode of living all point to the conclusion that she was making provision for a long invalidism with progressive disablement which would prevent her from making current payments to the unknown Samaritan of the future. It was for him or her, who could of course be a Mrs. Zimmerman or a Mrs. Fidler, but who was now unknown, that she was providing; not for the person, whose name is legion, who would offer medicine or a glass of water to, or place a pillow under the head of, *any* dying person.

It is not satisfactory procedure to accept parol testimony to explain unambiguous language in a will. Aside

from the monumental fact that the testator is not present to rebut any quotation improperly imputed to him, such an uncontrolled practice would make for unutterable confusion and chaos in the devolution of property. Even so, the language imputed to Mrs. Umberger by the claimants still does not change the plain import of her written will. Appellants' counsel declares in his brief that Mrs. Umberger told Adam Behney, one of the subscribing witnesses, "that it was her intention to reward the claimants, naming them, for their faithful services while her relatives did nothing for her." The record does not support this contention:

Adam Behney testifying: "Q. Did she make any statement why she was favoring Mrs. Fidler and Mrs. Zimmerman? A. Well, in connection with the will, I wouldn't say exactly so—no—I wouldn't say that. In accordance to the will—she said that. Q. Did she make any other statements to you that related to Margaret Zimmerman or her relatives—that she desired to favor them? A. Yes, I would say she did—she said the two named women—Mrs. Zimmerman and Mrs. Fidler—came in regularly and worked for her, while the relatives didn't do that. Q. Was that the reason for that provision in the will? A. That was part of the matter—I wouldn't say yes or no."

The appellants argue that for a year preceding Mrs. Umberger's death they attended to her while the relatives ignored her. Since the will was made eight months prior to her death, this would mean that for four months she had opportunity to appraise the neglect of her relatives and the devotion of the claimants. And it is a fact that she gave the largest share of all her property to her relatives. It is not likely that she would make such definite bequests or devises as she did to relatives if she had concluded them unworthy. Nor is it reasonable to suppose that she would have left the

determination of the other property to still another relative, her cousin, if he were unworthy.

It is also to be noted that if the relatives were neglectful, as the claimants contend, the testatrix had the opportunity, even during the eight months' period following the execution of the will, to change the will. The fact that she did not alter the will, once it was made, further discounts the claims of the two women.

Appellants' counsel maintains that the decision in the case of *Glasgow's Estate,* 243 Pa. 613, 90 A. 332, is a binding authority in his favor. In that case the testator bequeathed the residuary part of his estate to: "whomsoever takes care of me and nurses, and looks after my comfort during my last sickness or sees to it that I am properly nursed and cared for and given proper medical attention during my last sickness and a decent Christian burial after my decease." Our Supreme Court upheld the claim of the two claimants there, but the facts were quite dissimilar from those at bar. In the Glasgow case the decedent lived for three years in a room rented from the claimants. Prior to his last illness he was sick several times and Mrs. Thompson, one of the claimants, nursed him. During that last illness Mrs. Thompson obtained the services of a physician for him and then made arrangements at a hospital for his admission. She called at the hospital daily to see him. When he died she and her husband saw to it that he had a "decent Christian burial". In that case there was no guesswork as to whether the claimants qualified under the provisions of the will. Their services identified them as the only ones who could have so qualified.

The appellants also rely on *Reinheimer's Estate,* 265 Pa. 185, 108 A. 412, where the testator said: "As to the rest, residue and remainder of my estate, real, personal

and mixed, I give, devise and bequeath the same to the party or parties, their heirs and assigns forever, who may be farming my farm and taking care of me at the time of my death." The Court there also upheld the claimant who proved that he farmed the farm of the decedent and took care of him in his (the claimant's) own house until the time of his death. But the claimants in the case at bar did not meet the conditions of the Umberger will as the claimant in the *Reinheimer* case met the provisions of the Reinheimer will.

The Orphans' Court of Lebanon County cited *Rossman Estate*, 168 Pa. Superior Ct. 6, 76 A. 2d 450, as authority for its decision, and we agree that case was well chosen, for the facts there are quite similar to the ones in this case. The crucial provision in the will there involved read: "I give, devise and bequeath to those who are kind to me in my last illness and care for me all I have left without tax." About a year and a half following the execution of the will, the testatrix, Mrs. Anna S. Rossman, was found one morning unconscious on the bathroom floor of the Herring home in which she had rented a room for five months. Mrs. Hall, the claimant, went to the Herring house in response to a call, put a pillow under the decedent's head, covered her with a blanket and accompanied her in an ambulance to the hospital where she died, only seven hours after the stroke which had felled her in the bathroom. On this fragmentary service rendered by Mrs. Hall, the lower Court, under the pertinent provision of the will, made an award to Mrs. Hall.

The Superior Court reversed the lower Court, pointing out that the events of Mrs. Rossman's last day did not constitute a "last illness" as contemplated in the will: "Under the circumstances it is clear that testatrix did not contemplate sudden death from a catastrophic seizure and certainly the seven hours during which she

lived after the cerebral hemorrhage cannot be regarded as her 'last illness' in the sense contemplated by her."

Mrs. Rossman had enjoyed average good health for ten years prior to her death, but there was always the possibility that she might fall into an all-incapacitating illness which would shackle her to her bed. Judge HIRT of the Superior Court wrote: ". . . decedent was a lonely woman, seventy-nine years old, when she made her will. What she feared was a lingering illness and she intended to reward those who from kindly motives would 'care for' her by doing for her what she could not do for herself during such last illness."

The decree of the Orphans' Court of Lebanon County is hereby affirmed, costs to be paid by Appellant.