In re ESTATE OF CLARA D. ZANG, deceased.

No. 51029.

(Reported in 123 N.W.2d 883)

October 15, 1963.

Hammer, Matthias & Tyler, of Newton, for appellants.

Campbell, Campbell & Caldwell, of Newton, for Maude Jensma.

Korf, Diehl, Clayton & Cleverly, of Newton, for J. H. Diehl, executor.

Larson, J.—This is a proceeding in probate brought by the executor of the estate of Clara D. Zang, deceased, to have determined the identity of the beneficiary under Paragraph III of decedent's will, which provided as follows:

"Paragraph III. I hereby give, devise and bequeath all of the rest, residue and remainder of my estate, whether real, personal or mixed and wheresoever situated, unto my sister, Maude Jensma, who will be presently taking care of me, provided, however, that if at the time of my death, my sister has predeceased me or is not taking care of me at that time, then in that event I hereby give, devise and bequeath all of said property unto the

person or institution providing for my needs and caring for my personal well-being at the time of my death, provided further that this shall *not* be construed to mean that a temporary sojourn in a hospital immediately prior to my death would be within the terms of this bequeath and devise. By this paragraph it is my intention to leave any property remaining to the person or institution providing *a home* for my well-being at my death rather than to indicate simply for *medical services or medical attendants* at the time of my death." (Emphasis supplied.)

Involved was less than $5000, all in personal property.

Following notification of the application to construe, three parties responded as possible claimants. Maude Jensma based her claim upon the fact that she had established a home for testatrix and was caring for her sister's well-being at the time of her death, and that her sister had acquired no other home before she died. Freida Rutter, her only daughter, based her claim on personal attention to her mother's personal needs during her stay at a Newton hospital and at the Nelson Manor Nursing Home in Newton during her last illness. Margaret Johnson, alleged owner and operator of the nursing home, based her claim on the care rendered decedent during the period between Clara Zang's "hospitalization" in December 1959 and May 1960. Testatrix died May 28, 1960.

By agreement, the matter was tried as in equity and decree was entered adjudging that Maude Jensma was the person intended and designated as the sole legatee in Paragraph III of decedent's will. Claimants Freida Rutter and Margaret Johnson appeal, and under the rule we consider this appeal de novo. A careful review of the record convinces us the trial court was right and its judgment should be affirmed.

■■ I. Courts, of course, have no authority to make or remake the will of a testator. The function of the court is to determine whether there is any ambiguity in the provisions of the will, and then to admit extrinsic evidence to show the intent of the testator, and to aid in resolving any doubt arising from the language used in the will. Stoffel v. Stoffel, 241 Iowa 427, 432, 41 N.W.2d 16, 14 A. L. R.2d 891. Here evidence of the family relationship and the attending circumstances was correct-

ly admitted to resolve the doubt as to what person or institution testatrix intended in this bequest. No question is raised as to that proposition.

Certain accredited canons are generally applied in interpreting wills which do not themselves unmistakably reveal the maker's intention. They are sometimes stated as follows: (1) The law will impute to a testator's words such a meaning as, under all the circumstances, will conform to his probable intention and be most agreeable to reason and justice. Johnson v. Brasington, 156 N. Y. 181, 185, 50 N.E. 859, 860. (2) In determining the testator's intention the court should place itself as nearly as possible in his position, and hence should take into consideration the situation of the testator and the facts and circumstances surrounding him at the time the will was executed, the amount and character of his property at the time he made the will, the testator's relation to the beneficiaries, and their condition and circumstances. 95 C. J. S., Wills, section 592, page 767. It has been well said that the court should place itself, so-to-speak, in the testator's armchair and therein consider the circumstances by which he was surrounded, as an able assist in arriving at the testator's intention. Fact precedents are of little value, for each case must be considered in the light of the circumstances of that particular case. In re Estate of Hurlbut, 242 Iowa 353, 358, 46 N.W.2d 66; In re Umberger's Estate, 369 Pa. 587, 87 A.2d 290, 293.

The record discloses that for some time prior to the fall of 1959 the testatrix, Mrs. Zang, lived alone in Newton. She had not been on friendly terms with her sister, Maude Jensma, who resided in Prairie City, Iowa. Her daughter, who lived on a farm near Newton, rarely visited her mother.

After several sick spells in the early fall of 1959, Mrs. Zang decided she must give up her home and attempted to find other living quarters. She sold her house and prepared to sell her household goods at auction. Her request to move in with her daughter was rejected. Apartment hunting produced no satisfactory solution to her problem, and so on October 13, 1959, she wrote a letter to her sister, Maude Jensma, at Prairie City, and asked her to come to see her in Newton. She came, and their

past differences were quickly resolved. When Mrs. Zang expressed a desire to live with her sister, Mrs. Jensma agreed. Thereafter she and her husband, her daughter, and a friend, Mr. Klinker, spent several days helping Mrs. Zang prepare for her auction sale. The Jensmas then took testatrix to their home in Prairie City and provided her with a first-floor furnished room near the bathroom. They purchased a new three-quarter-size bed for her so there would be space in the room for her own chest of drawers, her clothes, and other items she chose not to sell at the auction and brought with her to Prairie City. She had the run of the house and ate her meals with the Jensmas.

A few days after her auction sale on October 29, 1959, testatrix visited her lawyer, John Diehl, in Newton. She had him prepare her will, the instrument involved herein. It was signed and witnessed on October 31, 1959. In Paragraph II she gave to her daughter, Freida Rutter, a note owed her by the Rutters in the sum of $1557.12 together with interest from March 1, 1950.

On or about December 11 Mrs. Zang decided she would like to visit her old friends and neighbors in Newton. Although her doctor in Prairie City was reluctant to let her go because of her high blood pressure, he did so upon her promise to return within three days. She took with her a suitcase containing items of clothing and some Christmas presents. While visiting at the home of her friend, Mrs. Estes Meyer, on December 13, 1959, she became quite ill. At her suggestion Dr. Frank Forsythe was called. He found she had suffered a stroke and advised that she be moved immediately to Skiff Memorial Hospital in that city. When she improved somewhat, Doctor Forsythe advised that she be taken to Nelson Manor, a nursing home in Newton, for special care during her convalescence. This was done on December 29, 1959, and she remained there until May 9, 1960. On that date she suffered a second stroke, lost consciousness, and was taken back to the hospital where she died May 28, 1960.

Considerable evidence appears in the record concerning the relationship of the claimants with the testatrix. The daughter Freida and her husband Ted Rutter were former tenants on Mrs. Zang's farm. They had owed her $1500 for some years on

account of property they received from the estate of her deceased husband. Mr. Rutter admitted they had not paid any interest on the debt since 1951, and there was testimony Mrs. Zang complained of that fact to her neighbors. When testatrix was preparing her will, she told her lawyer the cancellation of that debt should be enough for the Rutters and that " 'I don't want to leave her [Freida] anything' " more. She also told her neighbors there was no room for her "junk" with the Rutters, and it appeared they had told her they could not arrange for her to live with them in the fall of 1959. Apparently she had lived with them in 1946, for Mr. Rutter testified that she "moved in" on them on the farm they were then renting from her. An estrangement developed and Mrs. Zang moved to Newton in 1949, and sold her farm in 1951. Her daughter rarely visited her unless called by a neighbor, and the Rutters would not let their child stay overnight with Mrs. Zang, which grieved her very much. The Rutters did not help prepare for the auction sale nor aid her in finding an apartment. Mrs. Estes Meyer, a neighbor, testified that a few months prior to the auction sale she had asked Mrs. Rutter what to do if her mother became so ill that she could not look after her, and she was told to call the welfare department. Mrs. Rutter denied that statement. It is clear, however, that testatrix was greatly disturbed about her daughter's treatment of her, and that she often cried about it. Mrs. Meyer said, "It was on her mind all the time, and the last time she was there she said she didn't think she would be in that state if they had better relationship, that is, with her daughter."

The evidence is somewhat in dispute as to the attention Mrs. Rutter gave her mother at the hospital during December. One neighbor fed Mrs. Zang her noon meals, and another her evening meals. None saw her daughter do anything for her mother during that period. It appears Freida did visit her mother two or three times a week when she was in the nursing home, altered some dresses for her, and brought her some fruit, stationery, stamps, hose and undergarments, except when snow prevented travel. Mr. Rutter attended to the repair of her hearing aid. When Mrs. Zang suffered her second stroke, there is evidence Freida spent considerable time at her mother's bedside in the

hospital, but as testatrix was unconscious all that time, it did nothing to help her.

The record also discloses that although Maude Jensma, a sister of testatrix, lived but a few miles away, she had not seen Mrs. Zang for some fourteen years. This estrangement arose when the administrator of their mother's estate gave Clara Zang the share of Maude Jensma. Mrs. Zang told her neighbor Mrs. Meyer "she felt that her sister hadn't been treated just right and she would like to make it up to her sometime. That is that Mrs. Jensma had not been treated right in her parents' estate." A witness, Ernest Klinker, testified much to the same effect, and said Mrs. Zang told him "she was going to do something about that * * * she was going to try to make it up now after so many years, that she wanted to make her home there and was treating Maude right * * *."

When Mrs. Zang wrote her sister Maude on or about October 13, 1959, asking Maude to come and see her, she stated she would give Mrs. Jensma the Roberts family Bible. The evidence is undisputed that Mrs. Zang was very happy and content in the Jensma home and intended to make it permanent. When she went on her visit to Newton, Mr. Klinker testified, "She said she would be back to Prairie City." That statement was to Doctor Herney, now deceased. It is clear that both the testatrix and Mrs. Jensma always regarded the Jensma home in Prairie City as her home and that she intended to return there from her visit in Newton, from the hospital, and from the nursing home as soon as she was able. Mrs. Meyer testified: "She said she was very happy living at Maude Jensma's and said Maude was very good to her." Other witnesses testified likewise.

When Mrs. Zang was in the hospital she planned to go back to her home at Maude's. She said she did not like it in the hospital. She said she hoped she would soon be better so she could go back to Maude's. When she was in the nursing home she also voiced the desire to get back to her home with Maude. There is considerable testimony that she cried when she talked about going to Maude's, that she did not like it at the nursing home and said she would like to get back home. Although she was in no condition to be taken to Prairie City, she wanted the Jensmas

to take her home. Her new bed had not arrived until after she had gone to Newton and she wanted to see how it fit her room.

All testatrix' personal belongings, except those taken on the trip to Newton, remained in her room awaiting her return. Some new garments were purchased by her financial adviser, Mr. Dwight Smith, as needed. He paid for these and the services rendered Mrs. Zang at the hospital and the nursing home from her funds. As she could not leave those places, he came at her call and attended to her financial affairs.

The record further discloses that Margaret Johnson, one of the claimants, was a partner operating the Nelson Manor nursing home, that they catered primarily to the ill and those needing medical attention and nursing care, and that they maintained an attendant on duty night and day, had six persons working there, two of whom were always registered nurses or licensed practical nurses. Mrs. Johnson was a registered nurse and attended Mrs. Zang, giving her medication under Doctor Forsythe's direction. They were well equipped to furnish hospital care, having hospital-type beds with side rails. Patient charts were kept, with entries of bowel movements, temperature and pulse. Mrs. Johnson testified: "She [Mrs. Zang] was brought to the nursing home because she needed administration of medication and that was true all the time she was there. I gave her medication as a nurse and under the direction of Doctor Forsythe, her physician."

Doctor Forsythe testified "she was essentially a bedfast patient", and she was cared for in bed and in that condition at the nursing home. Obviously she was there in the hope she could be nursed back to health after her first stroke. She was there to convalesce and to regain her health. There was no testimony that Nelson Manor was a home for persons of advanced age or that Mrs. Zang intended to make that place her home. She was simply a nursing problem. From a great preponderance of the evidence it must be concluded this was not a home provided for her well-being, but was a temporary sojourn for medical service or medical attendance, much the same as in the hospital from which she was transferred by the doctor's direction.

II. A home, we have said many times, means a fixed or

permanent abode or habitation to which the party when absent intends to return. State v. Savre, 129 Iowa 122, 124, 105 N.W. 387, 3 L. R. A., N. S., 455, 113 Am. St. Rep. 452. The evidence here, we think, makes necessary a finding that testatrix intended her room with Mrs. Jensma as her home, and did not consider the hospital or the nursing home as meeting the provision of her will. Those sojourns were considered by her as temporary and were expressly excluded as hospital and professional nursing care.

We are cited several cases which hold, in substance, that a convalescent home is not a home but in reality a hospital. National Bankers Life Ins. Co. v. Hornbeak, Tex. Civ. App., 266 S.W.2d 228, 229, 231; Hull Hospital v. Wheeler, 216 Iowa 1394, 1398, 250 N.W. 637; Howard v. Harwood's Restaurant Co., 25 N. J. 72, 135 A.2d 161, 172, 173; Reserve Life Ins. Co. v. Marr, 254 F.2d 289, 290; Toland v. Murphy Bros., 172 Pa. Super. 484, 94 A.2d 156, 159. Also see 41 C. J. S., Hospitals, section 1, page 331, which states: "The ordinary meaning of the word 'hospital' does not include 'home for the aged' ", and in general "The word 'hospital' is used in many senses. Ordinarily a hospital is an institution for the reception and care of sick, wounded, infirm, or aged persons." We are satisfied from the use made of Nelson Manor by Mrs. Zang that it qualified as a hospital for her temporary care during her extreme illness.

Both sides cite People ex rel. Frax Realty Co. v. Kleinert, 123 Misc. 455, 205 N. Y. S. 728, as authority for their position. It holds in common usage a hospital is an institution which is maintained for the purpose of providing a place to which persons may resort for medical or surgical treatment, where nursing service is provided, either under a resident doctor or an outside doctor of one's own choosing. Also see Crain v. City of Louisville, 298 Ky. 421, 182 S.W.2d 787, 790, where an injunction to prohibit a nursing home in a certain locality was refused, as it qualified as a place where persons are treated who are infirm or ill, but not to such an extent as to require the attention and services given at a fully equipped hospital. Substantial numbers were convalescents needing special care while recuperating. The court said a nursing home is a good and descriptive word for the institution and classified it as a hospital.

III. We are satisfied, as was the trial court, that Nelson Manor qualified as a hospital in the sense that it was used and intended by the testatrix and the committing doctor. Therefore, her care, fully paid for by her, did not qualify that institution as a *home caring for her needs at the time of her death.* Nothing in this record indicates that Mrs. Zang's absence from the Jensma home was anything but temporary, nor that it was for any other purpose than for medical attention and special nursing care.

The services rendered by the daughter Freida also fail to qualify her. While much of her inattentiveness to her mother was no doubt due to her own illness, yet she did not furnish her mother a home or care for her well-being at the time of her death.

IV. Although it is true Mrs. Jensma did not render actual physical care of testatrix the last six months of her life, except for a period when she herself was in a hospital in Des Moines, she stood ready to do so upon Mrs. Zang's release from the hospital and nursing home. We, therefore, agree with the decision of the trial court, and its judgment declaring Maude Jensma the sole legatee of the residuary estate of Clara D. Zang must be affirmed.—Affirmed.

All JUSTICES concur.