Moltrup Estate.

Argued October 3, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*John D. Ray,* with him *Ray & Good,* for appellants.

*James M. Houston,* with him *Hilary G. Lynch,* and *Houston, Cooper, Speer & German,* for appellee.

*Samuel C. Holland,* Special Assistant Attorney General, *Charles A. Woods, Jr.,* Deputy Attorney General, and *Edward Friedman,* Attorney General, for Commonwealth, as parens patriae for charitable trusts.

OPINION BY MR. CHIEF JUSTICE BELL, January 4, 1967:

The questions involved in this appeal are many and the record is confusing. However, the two principal questions may be thus stated: (1) Did the *unconsumed* property which originally was part of the residuary estate of Walter J. Moltrup, husband of Mary E. Moltrup, together with the accretions thereof, belong to their son Merle as remainderman under the will of his father, or did such property belong to appellants and others, all of whom were appointees under Mrs. Moltrup's will; and (2) is Merle's executor estopped from asserting Merle's claim thereto by a prior accounting of the executrix of Mr. Moltrup's estate?

Walter J. Moltrup died November 1, *1940* leaving a will dated March 16, 1935. He was survived by his wife Mary E. Moltrup who died August 21, 1958, and their son Merle who survived both his father and mother and died on September 1, 1962. Merle was survived by his wife Viola, but left no issue.

Several appointees of Mrs. Moltrup's will appeal from a Decree of the Orphans' Court which sur an **executors' account in** *Mr.* Moltrup's estate directed distribution to Merle's executor of *Mr.* Moltrup's unconsumed residuary estate, including all the accretions thereof. Under Mr. Moltrup's will, his wife was the life tenant and donee of a power of consumption, with the further powers hereinafter referred to. The Orphans' Court further decided that under *Mr.* Moltrup's will, his wife Mary had no absolute or unconditional power of appointment and, we repeat, that Mr. Moltrup's unconsumed residuary estate with all its accretions was distributable *under his will* to his son Merle, subject to certain limitations hereinafter set forth.

The facts are so unusual and complicated that it is necessary to quote at length from Walter J. Moltrup's will.

164

"IV.

"All the rest, residue and remainder of my estate, of whatsoever character, and wheresoever situate, now owned, or hereafter acquired, by me, I give, devise, and bequeath to my wife, Mary E. Moltrup, for and during the term of her natural life, with full power of consumption of both principal and income, and with the right of sale of real estate of which I may die possessed, I further direct that my wife shall not be required to give any bond, or bonds, or to give any account of, or concerning, her consumption and use of the estate herein given her.

"V.

"Upon the death of my wife, Mary E. Moltrup, I give, devise and bequeath all the rest, residue and remainder of my estate not consumed by her in her lifetime, as well as the stock hereinbefore bequeathed, in paragraph II* hereof, to my son, Merle A. Moltrup, subject, however, to any trust or trusts that my said wife may appoint or make concerning the same in her Last Will and Testament, and, in the absence thereof, *to him absolutely.*\*\*. . .

"VI.

"It is my wish, will and intention that my wife, Mary E. Moltrup, shall have the right, if, in her judgment, it is advisable, in and by her Last Will and Testament, to create and make any and all trusts she may wish in favor of my son, Merle A. Moltrup, of any interest or estate passing to him by virtue of this will.

---

\* In paragraph II of his will, Walter gave 300 shares of stock of the Moltrup Steel Products Company to his wife Mary in trust *to pay the income and dividends therefrom to his son Merle for his life.* Mary E. Moltrup did not create any trust of this stock, and all the parties agree that Merle is entitled to this stock absolutely.

\*\* Italics throughout, ours.

## "VII.

"If my son, Merle A. Moltrup, shall predecease my wife, then the stock bequeathed in paragraph II hereof to my wife, Mary E. Moltrup, in trust for my son, Merle A. Moltrup, I give, devise and bequeath to my wife, for and during the term of her natural life with full power of consumption of both the principal and income thereof.

## "VIII.

"If my son, Merle A. Moltrup, shall predecease my wife, leaving lawful heirs to survive him, then any part of my estate remaining unconsumed by my wife at the time of her death, I give, devise and bequeath *to the lawful heirs of my son,* Merle A. Moltrup.

## "IX.

"If, at the time of the death of my wife, Mary E. Moltrup, my son, Merle A. Moltrup, shall have died, leaving no lawful heirs, then I direct any part of my estate remaining unconsumed by my wife shall be disposed of by her will to whom and in such amounts, and under such conditions as she sees fit.

. . . .

## "XI.

"In the event of the death of my son, Merle A. Moltrup, without lawful heirs, prior to the death of my wife, Mary E. Moltrup, and in the further event that my wife shall make no disposition of any part of my estate remaining unconsumed at the time of her death, then I give, devise and bequeath all the rest, residue and remainder of my estate so remaining unconsumed to my heirs at law, according to the Intestate Laws of the Commonwealth of Pennsylvania in effect at the time of my decease."

It has long been the well established law in Pennsylvania that a testator's intent is the polestar in interpreting a will.

In *Hoover Estate,* 417 Pa. 263, 207 A. 2d 840, the Court said (pp. 266-267) : "In Houston Estate, 414 Pa. 579, 201 A. 2d 592, the Court, quoting from prior decisions, said (pages 586-587) : '. . . " 'It is now hornbook law (1) that the testator's intent is the polestar and must prevail; and (2) that his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts; and (3) that technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting, or the testator's intent is for any reason uncertain : Dinkey Estate, 403 Pa. 179, 168 A. 2d 337; Pruner Estate, 400 Pa. 629, 162 A. 2d 626; Wanamaker Estate, 399 Pa. 274, 159 A. 2d 201; Hope Estate, 398 Pa. 470, 159 A. 2d 197.' "

" '. . . " 'It is not what the Court thinks he might or would or should have said in the existing circumstances, or even what the Court thinks he meant to say, but what is the meaning of his words. Kelsey Estate, 393 Pa. 513, 143 A. 2d 42; Britt Estate, 369 Pa. 450, 87 A. 2d 243; Sowers Estate, 383 Pa. 566, 119 A. 2d 60; Cannistra Estate, 384 Pa. 605, 121 A. 2d 157.' Saunders Estate, 393 Pa. 527, 143 A. 2d 367. See to the same effect Althouse Estate, 404 Pa. 412, 172 A. 2d 146. . ." : Woodward Estate, 407 Pa. 638, 640, 182 A. 2d 732.' "

In *Woelpper's Appeal,* 126 Pa. 562, 17 Atl. 870 (1889), the Court, speaking through Mr. Justice, later Chief Justice, MITCHELL, said (page 572) : "In the construction of wills the great general and controlling rule is that the intent of the testator shall prevail. And by his intent is meant his actual intent. It is often said, as in the language of Weidman's App., 42 Leg. Int. 338, quoted by our brother GREEN in Hancock's App., 112 Pa. 532, and cited by appellant, 'The

question in expounding a will is not what the testator meant, but what is the meaning of his words.' But by this it was never intended to say that the testator's meaning when apparent can be disregarded, but, that it cannot be got at aliunde, by what he might have meant, or even what under the circumstances perhaps he would have meant, but only by what he said. The search is confined to his language, but its object is still his meaning.

"*With the desire to reduce to a minimum the perplexity and uncertainty inseparable from the subject, courts have established certain more or less artificial and arbitrary canons of construction, by which certain forms of expression are presumed to have certain meanings, and in doubtful cases these presumptions are held to be decisive. But all of these canons are subservient to the great rule as to intent, and are made to aid, not to override it.* As in all such cases, care is required that tools shall not become fetters, and that the real end shall not be sacrificed to what was intended only as the means of reaching it." Accord: *Reck's Appeal,* 78 Pa. 432 (1875); *Baker and Wheeler's Appeal,* 115 Pa. 590, 593, 8 Atl. 630 (1887).

It is difficult to see how a testator could more clearly express his intention:

(1) That his wife Mary should have only a life estate in his residuary estate with a power of consumption of both principal and income;* and

(2) That all his residuary estate which was *unconsumed* by his wife Mary should go (a) to his son Merle if he survived Mary (subject to Mary's right to create a trust of this property for Merle for his life), or (b) if Merle predeceased testator's wife Mary, then to Merle's surviving lawful heirs.

In the clearest language testator expressed his intent that this unconsumed residuary estate should go

---

* With other powers not presently relevant.

(after the death of his wife Mary) to his son Merle or Merle's surviving lawful heirs; in other words, to the testator's son or his surviving lawful heirs and not to Mary or her heirs or relatives or her testamentary appointees, unless Merle predeceased Mary without leaving lawful heirs. It is equally clear that testator did not give Mary a fee or even a general power of appointment (unless Merle predeceased his mother Mary without leaving any surviving lawful heirs) and the testator made no provision for or expressed an intent to create a debtor-creditor relationship between Mary and Merle.

### Appellants' Contentions

Mr. Moltrup left an estate of $52,132.36. As the result of stock splits, stock dividends and the increased market value of some shares of stock, Mr. Moltrup's unconsumed residuary estate had increased at the death of his wife Mary to $206,658.88. Mary's testamentary appointees contend (1) that Mary occupied the position of a debtor in a debtor-creditor relationship and (2) that she was the debtor to *Mr.* Moltrup's remaindermen only in the sum of $45,794.37, which represented the sum of $52,132.36, the value of Mr. Moltrup's residuary estate at the time of the award or distribution to her, less $6,337.99, which was the value of the property she had consumed during her lifetime. To support this contention, appellants rely on *Powell's Estate,* 340 Pa. 404, 17 A. 2d 391, which, five years after Mr. Moltrup's will and several months after his death (followed still later by *Hays Estate,* 358 Pa. 38, 55 A. 2d 763), *decided for the first time in Pennsylvania* that a gift of a legal life estate *with power to consume* created a debtor-creditor relationship,* and

---

* This was quickly changed by §13 of the Estates Act of 1947 (Act of April 24, 1947, P. L. 100, §13, 20 P.S. §301.13), effective January 1, 1948, which provides that "A person having a present

the life tenant or her executor owed to the remainder-men only the value of the estate at the time she inherited it less the amount she consumed. If appellants' contention is sound, Mary and the executors of her will were (a) debtors to Walter's remaindermen and (b) debtors only in the sum of $45,794.37, and (c) the entire balance of Walter's unconsumed residuary estate together with all its accretions belonged to Mary absolutely, and she of course could will it to anyone and in such amounts as she desired.

Appellants' contention is unsound for each of two reasons: (1) It ignores or misconstrues the clear language and intent of Walter's will, and (2) *Powell's Estate* and *Hays Estate*, supra, *which changed the law after Walter's death,* are inapplicable to Walter's will.

Walter, as we have seen, died November 1, *1940,* leaving a will dated March 16, 1935. Prior to *Powell's Estate,* 340 Pa., supra, which was decided in 1941, *it had never been the law of Pennsylvania* that a testamentary gift of a (so-called) legal life estate *with power of consumption* and remainder over, created a debtor-creditor relationship between the life tenant and remaindermen. *Powell's Estate* and *Hays Estate* laid down a technical rule, or "a more or less artificial and arbitrary canon of construction,"—it was at best for appellants merely a rule of construction to aid in ascertaining testator's intent; it was not an inflexible rule of construction, and it did not and could not apply to the will of a man who died before 1941 when such a

interest in personal property, or in the proceeds of the conversion of real estate, which is not in trust, and which is subject to a future interest, shall be deemed to be a trustee of such property, and not a debtor to the remainderman, with the ordinary powers and duties of a trustee, . . ." Indeed, these cases were effectually repudiated even without the Estates Act by *Lyman Estate,* 366 Pa. 164, 76 A. 2d 633.

rule did not exist. *Lyman Estate,* 366 Pa. 164, 76 A. 2d 633.

In *Lyman Estate,* 366 Pa., supra, Justice, later Chief Justice, JONES said (pp. 168, 169, 170, 171): ". . . That the intention of a testator is the pole star in the construction of his will requires no citation of authority. . . .

"What, then, was William R. Lyman's testamentary intent? As the law stood in 1926 when he executed his will, a life tenant *with power to consume* had never been held to be a debtor of the remaindermen. Such a life tenant was then spoken of as a 'quasi trustee' for herself and the remaindermen: Watson's Estate, 241 Pa. 271, 280, 88 A. 433; and, the remainderman was *not* a creditor of a life tenant having a right of consumption: see Metz's Estate, 323 Pa. 241, 242, 185 A. 740. The rule of debtor-creditor relationship, which has pertained to an ordinary life tenancy, *was not extended to a life tenancy with power of consumption until the decision in Powell's Estate in 1941.* The testator cannot, therefore, be presumed to have intended to impose a legal liability upon his wife, as life tenant, which extant rules of construction did not then impose on the character of life estate which he bequeathed. . . '. . . On the subject of interpretation of wills it meets the cardinal and controlling principle that the intention of the testator must prevail. . . In the present case, therefore, as in all others, the question is, *what was the intention of the testator, and that is to be ascertained by what the testator understood to be the legal meaning of his language at the time he used it.'*

". . . The testamentary intent in the present instance is clear. The remaindermen were to take merely what was left of the testator's residuary estate, *in the form and at the value, as it existed upon Mrs. Lyman's death.* There is no occasion for resort to rules of construction. As was said by Mr. Justice LINN in Gordon

Estate, 360 Pa. 325, 330, 61 A. 2d 849,—'. . . it is elementary that such rules are never applied to defeat the expressed intention of a testator.' *Manifestly, such intention cannot justly be ascertained by an ex post facto rule of construction."*

To repeat, even if resort is had to a technical rule of construction, instead of ascertaining the intent of the testator from the language he employed, *Powell's Estate* and *Hays Estate* are not controlling for the reasons set forth in *Lyman Estate,* supra.

### Res Adjudicata, Estoppel?

Appellants have one additional argument, namely, that Walter's residuary legatee Merle and his executor are estopped from asserting Merle's claim because after his father's death, Mary as his executrix filed an executor's account to which no objection was made or exception filed, and which consequently was confirmed under a rule of Court in Beaver County.

In 1940, Beaver County did not have a separate Orphans' Court. Consequently, pursuant to §47(c) of the Fiduciaries Act of 1917,* and the rules of the Orphans' Court of Beaver County, Mary's account in her capacity as executrix of the will of her husband Walter J. Moltrup was filed in the office of the clerk of the Court. Solely as the result of this filing in Beaver County, the account was ipso facto confirmed nisi and no objections having been filed thereto, it was then confirmed under their Court rules without any audit** *and without any notice of Mary's claim having*

---

\* Act of June 7, 1917, P. L. 447, §47(c), 20 P.S. Ann., Ch. 3, App. §842 [repealed].

\*\* The attorney for Mrs. Moltrup, executrix, testified as follows: "By Mr. Ray: Q. The record indicates that the account was filed on June 3d, 1942 and confirmed nisi by the Court, and on June 13th there was an entry—No exceptions having been filed to

*been given to any remaindermen.* The only notice given to any remainderman or any heirs or any party having an interest or possible interest in the remainder, was an advertisement in a publication that an account had been filed by Mary E. Moltrup as executrix of the will of her husband Walter J. Moltrup, and in the absence of exceptions would be confirmed absolutely.

The account, which included debits and credits, contained the following: "Distribution in kind of the balance has been made as follows: Mary E. Moltrup." There then follows an enumeration of shares of stock of twelve different companies, plus a Pierce sedan automobile valued at $100, and cash $501.67. At the time of Mary's death, some of these stocks were registered in the name of Mary E. Moltrup, some were registered "Mary E. Moltrup life tenant u/w, Walter J. Moltrup with power of sale," and some were registered "Mary E. Moltrup, as life tenant under will of Walter J. Moltrup."

Mary's appointees contend that advertisement of the filing of the executrix's account, absence of exceptions thereto and the pro forma confirmation of the account constituted in legal effect a Court-awarded distribution to Mary personally and absolutely, with the same legal effect as if notice of her claim had been given to every party having a possible remainder interest and as if there had been an adversary proceeding and a binding adjudication with respect to her

the above and foregoing account, the same is hereby confirmed absolutely. Is it your recollection that this account, or schedule of distribution, as it appears thereon, was confirmed absolutely by this Court? Mr. Holland: Objection, your Honor. The Court: The account speaks for itself. As a matter of fact, at that time that was the proper procedure. If there were no exceptions filed after confirmation nisi, at the end of ten days it automatically became absolute and the Clerk so noted it on the record without further Order of Court."

claim. We reject this contention and place our decision on the ground that no actual or appropriate notice of Mary's present claim was ever given to the remainderman until after Mary's death in 1958.

We further note that at the time of the filing of Mary's account as executrix of her husband's will, the only questions appropriately and timely before the Orphans' Court were (1) a confirmation of the debits and credits contained in the account and (2) the award to Mary of a life interest with power of consumption. The disposition and the award of the unconsumed remainder, on this record, was clearly and unquestionably a matter for later determination by the Court when Mary's life estate had terminated. Certainly, the record, the advertisement and the above-mentioned award to Mary, with no actual notice to present and potential remaindermen—some of whom were unknown or unborn and all of whom were unrepresented—of the claim which Mary's executors made after her death (which was 18 years after her account as executrix of Walter's estate) could not bar the interest of remaindermen who had no notice of Mary's claim. See *Emmerich Estate,* 347 Pa. 307, 311, 32 A. 2d 400; *Johnson's Estate,* 276 Pa. 291, 296, 120 Atl. 128; Partridge-Remick, Pennsylvania Orphans' Court Practice, Vol. III, page 295. Cf. also *Stotesbury Estate,* 387 Pa. 591, 595, 128 A. 2d 587; *Ray's Estate,* 345 Pa. 210, 25 A. 2d 803; *Robins's Estate,* 180 Pa. 630, 37 Atl. 121; *Jones's Appeals,* 99 Pa. 124.

In *Johnson's Estate,* 276 Pa., supra, this Court struck down a testamentary appointment by the life tenant, and held that the interest of the remainderman must be governed and controlled by the will of the testator who created the gifts for life and the gifts in remainder. The Court pertinently said (pp. 295-296): ". . . The point is, Did he have more than a life interest? and, as involved in that point, What became

of the estate at his death? The most convenient, if not appropriate, time to raise and settle these questions was at the audit of the account filed after Elwood's [the life tenant's] death; . . .

"As for the contention of res judicata, we agree with the opinion of the court below that the prior adjudications 'did not go further than to determine the validity of the trust for the life of Elwood [the life tenant], if they went that far.' "

Under the above-mentioned authorities, it is clear that at the time of the confirmation of the account of Mary E. Moltrup as executrix of Walter's will, *the rights of the remaindermen* were not properly and timely before or determinable or actually determined by the Orphans' Court, and therefore under the facts and the record in this case, the doctrine of res adjudicata or estoppel is inapplicable.

Decree affirmed, each party to pay own costs.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

The most important issue on this appeal is whether, within the four corners of this will, a testamentary intent is *evidenced,* either expressly or by implication, which precludes the application of an established rule of testamentary construction.[1]

---

[1] I fully agree with the majority opinion that, if a testamentary intent to the contrary *can be shown,* the rule of construction must yield. See: *Lyman Estate,* 366 Pa. 164, 168, 76 A. 2d 633 (1950) ; *Burleigh Estate,* 405 Pa. 373, 376, 175 A. 2d 838 (1961) ; *Dinkey Estate,* 403 Pa. 179, 182, 168 A. 2d 337 (1961). However, I am not unmindful of that which this Court said in *Kelly's Estate,* 193 Pa. 45, 44 A. 289 (1899) : "It is true ... that no rule of construction is settled in the sense that it must be unbendingly applied to all cases. *But there are cases in which to cast all rules aside will be to fish for the testator's intent without a line".* (p. 50) (Emphasis supplied)

This rule of testamentary construction may be thus stated: where there is a testamentary gift of *personalty* to a person for life, with the express power given to the life tenant to consume such personalty, followed by a gift over, on the death of the life tenant, of the unconsumed portion of such personalty, the relationship of the life tenant to the remainderman is that of debtor to creditor to the extent of the *value* of the personalty when distributed to the life tenant. See: *Hays Estate,* 358 Pa. 38, 55 A. 2d 763 (1947); *Powell's Estate,* 340 Pa. 404, 17 A. 2d 391 (1941).[2] Such rule is one of construction, not of law.[3]

In *Gramm Estate,* 420 Pa. 510, 515, 516, 218 A. 2d 342 (1966), we said: "In this Commonwealth, limitations over after a gift of a life estate in personalty were early recognized, even without the intervention of a trustee, 'though it was always held that the life tenant was entitled to the possession of the thing so bequeathed, and this right carried with it the power to make his possession valuable, according to circumstances.' See also: Eichelberger v. Barnetz, 17 S. & R. 293, 294 (1828); Kinnard v. Kinnard, 5 Watts 108, 110 (1836); Holman's Appeal, 24 Pa. 174, 178, 179 (1854); Bregy, Intestate, Wills and Estates Acts of 1947, pp. 5954 et seq.

"By the enactment of legislation . . . security was required to be given by the life tenant of personalty for the protection of the remainderman. The case law which developed considered the relationship between

---

[2] The Estates Act of 1947 (April 24, 1947, P. L. 100, §13, 20 P.S. §301.13, effective January 1, 1948, which abolished *prospectively* the debtor-creditor theory and substituted a trust relation by operation of law is inapplicable in the case at bar.

[3] *Tyson's Estate,* 191 Pa. 218, 43 A. 131 (1899); *Lyman Estate,* 366 Pa. 164, 171, 76 A. 2d 633 (1950). Cf. *Lyman Estate,* 69 Pa. D. & C. 491, wherein the late and illustrious Judge HUNTER termed the rule a "rule of property".

the life tenant and the remainderman where personalty was given for limited period and with a gift over, without the intervention of or the creation of a trust, to be that of debtor and creditor; the life tenant became a debtor to the remainderman in the amount originally received by the life tenant and the remainderman became a creditor of the life tenant or his estate for the value of the personalty when received. Up until 1931 (Strawbridge's Estate, 14 Pa. D. & C. 703), the decisions all involved situations where the courts were determining the relationship between the life tenant and remainderman where the former had entered security or where the entry of security was expressly waived either by the provisions of the will or by agreement of the parties. However, in Strawbridge's Estate, supra, where the court was confronted with a situation where the life tenant had neither entered nor been excused from entering security, the late Judge GEST ruled that the rights of the life tenant and the remainderman were the same whether security was entered or not. See also: Gillett's Estate, 130 Pa. Superior Ct. 309, 318-321.

"Finally, in Powell's Estate, 340 Pa. 404, 409-412, 17 A. 2d 391, this Court, reaffirming the existence of a debtor-creditor relationship between the life tenant and remainderman of personalty, held (a) the life tenant was responsible only for the value of the estate at the date of distribution and not for any increase of the value of the fund thereafter, (b) even though a life tenant posts no security, the life tenant remains a debtor to and not a trustee for the remainderman and (c) legislation requiring a life tenant of personalty to post security did not apply to a life tenant to whom had been given the power of consumption of principal."

The thrust of our inquiry should be whether, within the four corners of this will, a testamentary intent, express or implied, *can be demonstrated* that the debtor-creditor relationship be not applied in the interpreta-

tion of this will. If such intent *can be shown,* then the rule of construction must yield; otherwise, the rule of construction controls. I am of the opinion, from an examination of this will, that such testamentary intent is not present, either expressly or by implication.

In seeking to ascertain the intent of a testator we examine the will, its language, its scheme of distribution and the attendant circumstances: *Houston Estate,* 414 Pa. 579, 586, 201 A. 2d 592, 595, 598 (1964). The intent we seek is the "actual, personal, individual intent" and not "a mere presumptive conventional intent inferred from the use of a set phrase or a familiar form of words": *Tyson's Estate,* supra, p. 225. The majority opinion correctly says that "a testator's intent is the polestar in interpreting a will"; however, such statement carries no magic. "To say that the intention of the testator is the pole star of construction, is merely to formulate the trouble without giving a remedy for it. The intention is to be sought primarily in the words, as the pole star in the sky, but sometimes the pole star is so obscured in the clouds of words that it takes a skillful astronomer to see it." Gest, Drawing Wills and the Settlement of Estates in Pennsylvania, at p. 5. In seeking to discover the presence or absence of such intent, we must be zealous to avoid substituting our own view of what the testator should have intended for that which the will reveals, if it does, as to testator's actual intent.

The majority opinion concludes that this will does reveal an intent on the part of the testator which precludes application of the established rule of testamentary construction, i.e., a testamentary intent that the debtor-creditor theory should not apply. In my view, the stated premises upon which the majority opinion predicates its conclusion lack basis in fact and in our case law.

First, the majority opinion states: "In the clearest language testator expressed his intent that this unconsumed [4] residuary estate should go (after the death of his wife Mary) to his son Merle or Merle's surviving lawful heirs [the remaindermen]; in other words, to the testator's son or his surviving lawful heirs and not to Mary [testator's wife] or her heirs or relatives or her testamentary appointees. . . ." What the majority says, in effect, is that, since testator clearly provided that the gift over be to his son and the son's legal heirs, i.e. blood relatives,[5] then testator must have intended that the debtor-creditor relationship should not apply. The majority opinion errs, in my view, because the instant factual posture presents a classic posture for application of the debtor-creditor rule. Moreover, the majority further falls into error in equating "blood relatives" with "legal heirs": *Leopold Estate,* 356 Pa. 543, 546, 52 A. 2d 458 (1947). This premise, I submit, is a weak reed upon which to rest a finding of contrary intent.

---

[4] The use of the word "unconsumed" or words of similar import reveals no contrary intent: *Straub's Appeal,* 1 Pa. 86 (1845); *Gold's Estate,* 133 Pa. 495 (1890); *Watson's Estate,* 241 Pa. 271, 88 A. 433 (1913); *Houser v. Houser,* 268 Pa. 401, 112 A. 29 (1920); *Benedict v. Hawthorn,* 270 Pa. 529, 113 A. 416 (1921); *Edwards v. Newland,* 271 Pa. 1, 113 A. 742 (1921); *Byrne's Estate,* 320 Pa. 513, 181 A. 500 (1935); *Powell's Estate,* 340 Pa. 404, 17 A. 2d 391 (1941).

[5] If testator did intend, as the majority opinion believes, to restrict his line of inheritance to *blood lines,* such intent has clearly been thwarted. Under the will of testator's son (the remainderman) no blood relative receives any inheritance. Moreover, even the most cursory examination of our case law reveals that the debtor-creditor relationship has been applied most often where the remainderman was a blood relative. See: *Reiff's Appeal,* 124 Pa. 145, 16 A. 636 (1889) (grandchildren); *Weir's Estate,* 251 Pa. 499, 96 A. 1086 (1916) (children); *O'Donnell's Estate,* 252 Pa. 45, 97 A. 182 (1916) (grandchildren); *Kirkpatrick's Estate,* 284 Pa. 583, 131 A. 361 (1925) (children).

Second, as evidence of testator's intent, the majority opinion states "It is equally clear that testator did not give Mary a fee or even a general power of appointment. . .". As criteria of a contrary intent, this premise is obviously untenable. Had testator given his wife a fee or a general power of appointment, then clearly the debtor-creditor theory would not apply. This rule of construction *never* applies where a fee or general power of appointment has been given but only where the first taker is given personalty for life, with or without the power of consumption.[6]

Lastly, as indicia of a contrary intent, the majority opinion points to the absence of any provision for or the specific expression of an intent to create a debtor-creditor relationship. Assuming arguendo, the majority opinion is correct in its statement that until the decision in *Powell's Estate,* supra, the gift of a life estate in personalty with the power to consume was not considered to create a debtor-creditor relationship— a statement with which I completely disagree—then, since the instant testator did not include in his will a provision for the establishment of the debtor-creditor relationship, the majority concludes testator did not intend that such relationship be established. Reliance on this premise reveals a misunderstanding of the rule of construction. Our research does not reveal a single instance in our case law where the debtor-creditor relationship was recognized because of provision therefor in the testamentary instrument; were it otherwise, there would be no necessity for the application of the rule of construction.

The real key to the thinking of the majority opinion is that when distribution was made in 1942 to the life

---

[6] Cf. *Appeal of Merkel,* 109 Pa. 235 (1885) ; *Drennan's Appeal,* 118 Pa. 176 (1888) ; *Freeman's Estate,* 220 Pa. 343, 344, 69 A. 816 (1908) ; *Rogers' Estate,* 245 Pa. 206, 91 A. 351 (1914).

tenant the personalty had a value of $52,132.36,[7] where-
as the value of such personalty when the life tenant
died was $173,658.88. The majority thinking is that
to give the remainderman this entire amount produces
the result which the *supposed* intent of the testator
dictates. The majority opinion would hold the life
tenant's estate responsible not only for the value of
the personalty when distribution was made to the life
tenant but also for that value *plus* the increase in
value up to the time of her death. Such a result could
not possibly be reached under the rule of testamentary
construction; to avoid such rule the majority of this
Court finds what it considers a testamentary intent
but what in reality is a *supposed* or *invented* intent.
To me the majority opinion finds intent where none
exists and completely fails to demonstrate the source
or sources in the will upon which a finding of such
intent can be rationally bottomed. Unfortunately, in
my view, the decision of the majority is a striking ex-
ample of judicial interference in order to reach a re-
sult which it considers desirable.

Even if the majority opinion was correct in its
statement that a testamentary gift of a life estate in
personalty with a given power of consumption fol-
lowed by a limitation over of the unconsumed portion
did not give rise to a debtor-creditor relationship until
the enunciation of such rule by this Court in 1941 in
*Powell's Estate,* supra, the fact remains that this Court
since then, on at least two occasions, has recognized
the applicability of this rule of testamentary construc-
tion to "the life tenant with power of consumption"
situation. See: *Hays Estate,* 358 Pa. 38, 55 A. 2d 763
(1947) and *Lyman Estate,* 366 Pa. 164, 76 A. 2d 633
(1950). We have always held that when a judicial

---

[7] Subtracting the value of personalty consumed by the life ten-
ant, the value of the *unconsumed* personalty is $45,794.37.

decision is rendered the law is not presumed to be *changed* by it but to have been the same before as after such decision. See: *Hood v. Penna. Society, etc.,* 221 Pa. 474, 479, 70 A. 845 (1908).

For many, many years this Court has recognized that, where a testator bequeathes personalty for life to one person, with a limitation over of the "residue", "the remaining part" or words of like import but *without a grant to the life tenant of any right to consume,* the life tenant vis-a-vis the remainderman occupies the status of a debtor: *Markley's Estate,* 132 Pa. 352, 19 A. 138 (1890); *Heppenstall's Estate,* 144 Pa. 259, 22 A. 860 (1891); *Hambright's Appeal,* 2 Grant 320 (1855); *Gold's Estate,* 133 Pa. 495, 19 A. 485 (1890); *Welsh's Estate,* 239 Pa. 616, 86 A. 1091 (1913). Moreover, we have held that a life tenant, without power to consume was entitled to any accretions in the value of the personalty during his lifetime (*Letterle's Estate,* 248 Pa. 95, 93 A. 935 (1915); *Kirkpatrick's Estate,* 284 Pa. 583, 131 A. 361 (1925) and was responsible for any depreciation or loss in value (*Gillett's Estate,* 130 Pa. Superior Ct. 309, 197 A. 517 (1938); *Strawbridge's Estate,* 14 Pa. D. & C. 703 (1931)).[8]

Up until the Estates Act of 1947, supra, the law was clear that a life tenant without power of consumption was a *debtor to the remainderman* and responsible to the remainderman *only* for the value of the estate ascertained at the time he received it. When considering the situation of a life tenant with the power of consumption why should a more stringent rule be adopted? When a testator gives personalty to a person for life and then confers upon the life tenant the power to consume the personalty, certainly the

---

[8] *Lyman Estate,* supra, relieved the life tenant of responsibility for losses in value on the ground the will of Lyman indicated a contrary intent.

testator has given the life tenant almost absolute dominion over the disposal of the personalty. *Powell,* in applying the debtor-creditor relationship to a "life tenant with power to consume" situation, *actually* restricted the right of the life tenant in that *Powell* held the life tenant responsible for maintenance of the value of the personalty even though under the will the life tenant had the right to consume all the personalty; by making the life tenant responsible for maintenance of the distributed value, the court withdrew from the power to consume the right to consume such amount of personalty as might reduce that value. It does not seem logical to hold a life tenant with power to consume to the same restrictions imposed on a life tenant without power to consume. Particularly is this so when in the case at bar the majority of this Court now denies to this life tenant's estate the right to the increase in the value of the personalty whereas in our case law a life tenant without the power to consume has *always* been held to have the right to such increases in value.

It is clear beyond question the majority opinion relies solely on *Lyman Estate,* supra, which avoided the rule of *Powell* and *Hays* by finding a *supposed* intent of the testator to the contrary. In my view, *Lyman* is incorrect.[9] *Lyman,* by finding what it supposed to be a contrary intent, not only ignored the rulings in *Powell* and *Hays* but also those in *Letterle, Kirkpatrick, Gillett* and *Strawbridge.*

Generally, courts will not interfere with the first taker's control of the personalty unless the remainder-

---

[9] See: dissenting opinion of the late Mr. Justice STEARNE in *Lyman.* I agree with the statement of the note writer in 99 U. of Pa. L. Rev. 873, 876: "Logically, there is no distinction between the language of the will in [Lyman] and the language of the wills in [Powell and Hays] involving life estates with power to consume . . ." and the footnote that "no mediaeval scholastic could differentiate between the expressions used."

man makes out a strong case requiring interference: *Gramm Estate,* supra, p. 518 and authorities therein cited. However, as we said in *Tyson's Estate,* supra, pp. 226, 227: "But a transfer [by the life tenant] with intent not to consume herself, but to preserve for others after her death, and to change the beneficiaries after her from those chosen by her husband to others of her own selection would be a fraud on the testator and his will. . . ." Under the terms of the instant will the power of consumption of principal and income by the life tenant was certainly not to be without restriction: her consumption was intended to be in good faith and her diversion of the personalty to others was not contemplated.

If we examine this will it is crystal clear that, upon the life tenant's death, if any portion of the personalty remained unconsumed, such personalty, under the scheme of the will, was to go to the remainderman and his legal heirs. What the life tenant attempted to do was to divert such personalty to persons other than the remainderman and his heirs. She was thus thwarting the clear intent of this testator [10] and upon this ground the instant result might be justified. The majority do not even consider this ground.

I believe that the life tenant was a debtor to the remainderman to the extent of the value of the personalty distributed to her. I further believe that, insofar as the value of such personalty is concerned, any attempt by the life tenant to divert personalty to others than the remainderman cannot be countenanced. However, as to the increase in value of such personalty, I believe our case law mandates that such increase belongs to the estate of the life tenant.

---

[10] Cf. *Gramm Estate,* supra, which was decided under the Estates Act of 1947, supra.

The majority of this Court now overrules *Powell* and *Hays* under the guise of finding in this will a testamentary intent, an intent the basis of which the majority opinion fails to reveal. We hear much of the doctrine of stare decisis; in no area is such doctrine more important than in the construction of wills which involve valuable property rights. If the majority of this Court believe that *Powell* and *Hays* are incorrect, courageously *Powell* and *Hays* should be held no longer authoritative. What the majority opinion does, however, is to avoid following *Powell* and *Hays* by the use of a fiction of a supposed testamentary intent. To do so renders meaningless the doctrine of stare decisis.

I could reach the same result at which the majority arrives by finding that the life tenant was attempting to divert to persons other than the son and his heirs the value of the personalty when distributed to her. However, I believe that the enhancement in value of the personalty belongs to the estate of the life tenant and not to the estate of the remainderman.

The second and last issue raised by the estate of the life tenant is whether the distribution to the life tenant is subject to challenge 22 years later. I would permit such challenge but on grounds other than the majority allows such challenge. My study of this record indicates that the remainderman did not receive notice of the proposed distribution in 1942; on that ground I would permit an attack on the distribution.

I would reverse the decree of the court below.

Mr. Justice EAGEN joins in this dissenting opinion.