683 A.2d 894

In re the BARNES FOUNDATION, a corporation.

Appeal of BARNES FOUNDATION AND ITS TRUSTEES ("FOUNDATION"), Appellants.

Superior Court of Pennsylvania.

Argued March 13, 1996.

Filed Sept. 12, 1996.

Bruce W. Kauffman, Philadelphia, for appellants.

Jeffrey A. Lutsky, Philadelphia, for De Mazia Trust, participating party.

Before CAVANAUGH, KELLY and OLSZEWSKI, JJ.

KELLY, Judge:

This appeal is brought from an order of the Court of Common Pleas of Montgomery County granting in part and denying in part appellant's [1] petition to "amend and clarify" the Trust Indenture and Agreement of the late Albert C. Barnes. We affirm in part and reverse in part.

This case is the latest in a long line of cases related to the famous "Barnes Collection" of art work and to the institution which houses that collection.[2] Appellant initiated this proceeding by filing a petition in the Court of Common Pleas seeking modification or relief from the terms of the original indenture, and the judicial gloss that has been applied to it.[3] Appellant subsequently amended its petition and it was upon the second amended petition that the Court of Common Pleas took testimony and entered the order in question. In its "second amended petition," appellant sought relief from, or clarification of, the following terms of the indenture.

During Donor's lifetime moneys available for investment or reinvestment, whether principal or income, may be invested in any good securities whether legal investments for Trustees or not; but after Donor's death, such moneys may only be invested by Donee in such obligations of the United

1. For ease of discussion, we consider The Barnes Foundation to be the appellant. We recognize, however, that the initiating petition was actually filed by the members of the Board of Trustees of the Barnes Foundation acting in their official capacity.

2. *See Commonwealth v. Barnes Foundation,* 398 Pa. 458, 159 A.2d 500 (1960); *Wiegand v. Barnes Foundation,* 374 Pa. 149, 97 A.2d 81 (1953); *Barnes Foundation v. Keely,* 314 Pa. 112, 171 A. 267 (1934); *In re Barnes Foundation; Estate of Violette De Mazia,* 453 Pa.Super. 436, 684 A.2d 123 (1996); *In re Barnes Foundation,* 449 Pa.Super. 81, 672 A.2d 1364 (1996); *In re Barnes Foundation, Appeal of Tinari,* 443 Pa.Super. 369, 661 A.2d 889 (1995).

3. In 1960, the Court of Common Pleas of Montgomery County approved a limited access program of two days per week. In 1963, the Court of Common Pleas authorized a public admission fee of $1.00. Finally in 1967, the Court of Common Pleas authorized an additional half day of public access. Thus, at the time of this hearing, the public access to the Barnes gallery was limited to two and one-half days per week and an admission charge of $1.00.

States of America, obligations of the several States of the United States and obligations of municipal corporation and districts in the several States of the United States which are legal investments for saving banks under the laws of the State of New York.

Paragraph 27 as amended January 29, 1941.

It is therefore stipulated by the Donor that at no time after the death of said Donor, shall there be held in any building or buildings any society functions commonly designated receptions, tea parties, dinners, banquets, dances, musicales or similar affairs, whether such functions be given by officials, Trustees or employees of The Barnes Foundation or any other person or persons whatsoever, or whether such function be private or public. It is further stipulated that any citizen of the Commonwealth of Pennsylvania who shall present to the courts a petition for injunction based upon what reputable legal counsel consider is sufficient evidence that the above-mentioned stipulation has been violated, shall have his total legal expense paid by The Barnes Foundation.

Paragraph 33.

On Saturday of each week, except during the months of July and August of every year, the gallery and the arboretum shall be open to the public between the hours of 10:00 a.m. and 4:00 p.m. under such rules and regulations as the Board of Trustees of Donor may make.

Paragraph 30, as amended April 30, 1946.

The relief requested by appellants can be summarized as follows:

1. As to the investment restriction appellant sought permission to expand its investment option and invest funds pursuant to the Pennsylvania Probate and Fiduciaries Code. 20 Pa.C.S. § 7302 *et seq.*

2. As to the restriction on society functions appellant sought a clarification from the Court to the effect that functions which have as their purpose the raising of funds for the exclusive benefit of The Barnes Foundation not be

considered "society functions," and consequently should be permitted.

3. As to the times or fees for public admission appellant sought permission to set these terms within its unfettered discretion.

*See* Second Amended Petition of The Barnes Foundation.

On September 13th and 14th of 1995, a hearing was held before the Honorable Stanley R. Ott of the Court of Common Pleas of Montgomery County. Appellant was permitted to put on evidence in support of its claims for relief. At the hearing, the representative of the Violette de Mazia Trust[4] appeared to object to the requested relief. Also, a representative of the Office of the Attorney General was approved as a representative in *parens patriae* of the citizens of the Commonwealth; the Attorney General did not object to the requested relief.

After the hearing, Judge Ott issued the following decree.

AND NOW, this 21st day of September, 1995, after hearing, it is hereby ORDERED, ADJUDGED and DE-CREED that Paragraph 27 of the trust and indenture executed by and between Dr. Alfred C. Barnes and the Barnes Foundation under date of December 6, 1922, as amended, is amended to read as follows:

27. During Donor's lifetime moneys available for investment or reinvestment, whether principal or income, may be invested in any good securities whether legal investments for Trustees or not; but after Donor's death, such moneys must be invested by Donee in accordance with the investment powers and privileges of fiduciaries under Chapter 73 of the PEF Code.

4. The de Mazia Trust was accorded standing by virtue of its status as a "support organization" for the Barnes Foundation. In this appeal, appellant seeks to challenge that ruling by arguing in its reply brief that the de Mazia Trust lacks standing. We need not address this issue because neither Judge Ott's decree, nor the requirement of judicial approval for a deviation, depends upon the standing of the de Mazia Trust.

Paragraph 10 of the Decree of this Court dated March 29, 1963, is hereby amended to read as follows:

10. The Board of Trustees shall be authorized to charge an admission fee not in excess of five dollars per person to all members of the general public (excepting students formally enrolled in the Foundation's classes and their instructors), who shall be admitted to the Art Gallery under the visiting program prescribed in the consent decree dated December 12, 1960, the decree dated February 24, 1967, and the decree dated September 18, 1995.

It is further DECREED that the Barnes Foundation's present program of admission of the public to its art gallery, pursuant to the consent decree of this Court entered December 12, 1960, and amended by Decree dated February 24, 1967, is modified and enlarged to authorize and direct the Trustees of the Barnes Foundation to open the art gallery one additional full day per week.

In all other aspects, the provisions of the trust indenture (including the prohibition against society functions at the Foundation) and of the previous decrees of this court shall remain unchanged and of full effect.

This is a final Decree not subject to the filing of exceptions.

Appellant now brings this appeal.

Appellant in its brief poses four issues;[5] however, these issues can be rephrased as two: *i.e.*, whether the trial court

5. Appellant's questions raised on appeal were phrased in the following manner:
   1. Whether the Orphans' Court should have permitted proposed deviation from a 1922 Indenture to enable a charitable trust to fulfill its donor's dominant purpose where *uncontradicted* evidence of changed circumstances not anticipated by the donor confirmed the need to do so?
   2. Whether the Orphans' Court committed errors of law, abused its discretion and capriciously disregarded *uncontradicted* evidence by refusing to grant relief, sought by the trustees and approved by the Attorney General as *parens patriae*, critically necessary to ensure the survival of a public charitable foundation?
   3. After recognizing that deviation was necessary, did the Orphans' Court abuse its discretion by substituting its preferences for propos-

erred in refusing to grant the requested relief where the evidence of changed circumstances was uncontradicted and the relief requested was approved by the Attorney General; and whether the trial court erred in refusing to interpret the indenture language related to "society functions" in a manner which would permit functions for the raising of funds for the exclusive benefit of the Foundation.

We will address the second issue first. By terms of the indenture, the following activities were prohibited: the holding of "any society functions commonly designated receptions, tea parties, dinners, banquets, dances, musicales *or similar affairs.*" (Emphasis added). Appellant sought a judicial interpretation of this paragraph prior to proceeding with any on-site fund raising activities. As noted above, Judge Ott interpreted this paragraph as prohibiting such activities. We are compelled to disagree.

Prior to examining this paragraph, we note that the interpretation of the words of a trust or will is a question of law and thus our scope of review is not confined by the decision of the trial court. *Dudash v. Dudash,* 313 Pa.Super. 547, 553, 460 A.2d 323, 326 (1983). Turning to the language itself, it is apparent that there is *no* explicit prohibition against on-site fund raising functions. Thus, Judge Ott's decision was necessarily based on a determination that fund raising functions fall within the category of "similar affairs."

In interpreting the language of the paragraph, we are aided in our work by the construction principle known as "ejusdem generis," which provides that when words of general

 als by trustees of a public charitable foundation, approved by the Attorney General as *parens patriae,* where the only objections came from parties without standing who offered *no* testimony to support their opposition?

4. Did the Orphans' Court commit errors of law and abuse its discretion when it needlessly interpreted archaic language in a 1922 Indenture relating to "society" functions in the most restrictive manner possible and refused to clarify or change that language where *uncontradicted* evidence established the need to do so in order for a public charity to engage in significant fund raising efforts necessary for its day-to-day operations?

Appellant's Brief at 3.

meaning are preceded by, and connected with, words of narrower impact, the interpretation of the words of general meaning will be confined to the species of things more specifically described. *See In re Beisgen's Estate*, 387 Pa. 425, 434, 128 A.2d 52, 56 (1956).[6]

Here, the language of Dr. Barnes' indenture described "receptions, tea parties, dinners, banquets, dances [and] musicales" as the specifically prohibited activities. Each of these activities is by its nature a private affair having as its purpose nothing more than the enjoyment of its participants. It is obvious that the late Dr. Barnes did not wish to have his school and gallery trivialized by the use of it as a mere rental hall for socialites. However, nothing in appellant's application or in the testimony in support of that application suggest that the Foundation seeks to violate that intention.

There is a decided difference between fund raising functions which have as their purpose the preservation and enrichment of the assets which the Foundation is charged with protecting, and a social affair which has as its purpose the inclusion of some and the exclusion of many. Thus, we are compelled to disagree with Judge Ott's interpretation of this paragraph to extend its proscription to fund raising activities. We wish to emphasize, however, that it is our interpretation that nothing in the paragraph prohibits fund raising functions which have as their sole purpose the raising of funds for the institution, and there is no need for a deviation or modification of the terms of this paragraph; and the paragraph will continue to include the safeguard from abuse which Dr. Barnes intended: *i.e.* that "any citizen of the Commonwealth [may] present to the court a petition for injunction based upon what reputable legal counsel consider is sufficient evidence that the above-mentioned stipulation has been violated." *See* Barnes Indenture, para. 30.

**6.** Though normally the principle is applied to statutory construction, 1 Pa.C.S.A. § 1903(b), it is applicable to the interpretation of wills and trusts as well. *See In re Beisgen's Estate*, 387 Pa. 425, 128 A.2d 52 (1956); *In re Donaldson's Estate*, 362 Pa. 357, 67 A.2d 88 (1949); *McCollum v. Braddock Trust Co.*, 330 Pa. 293, 198 A. 803 (1938).

■ Turning to the second issue, in order for appellant to succeed in its request for relief, it was necessary to show that a deviation from the terms of the indenture was necessary.[7] The doctrine of deviation has been summarized in the Restatement (Second) of Trusts:

[A] court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.

Restatement (Second) of Trusts § 381 (1959). Those terms subject to deviation are limited to administrative provisions of the trust, *i.e.*, "the details of administration which the settlor has prescribed in order to secure the more important result of obtaining for the beneficiaries the advantages which the settlor stated he wished them to have." Bogert, The Law of Trust and Trustees § 561, at 27.

■ In order to permit deviation from the administrative provisions of a trust, courts generally require the presence of two elements: "(1) unforeseen and unforeseeable change in circumstances, and (2) a frustration of the settlor's main objectives by this change, if strict obedience to the settlor directions were required." Bogert, *id.* at 230. It must be emphasized that the relief afforded by deviation is not based on mere convenience, but on the necessity of effecting a change in a situation where compliances with the terms of the trust "would defeat or substantially impair the accomplishment of the purposes of the trust." *Colin McK. Grant Home v. Medlock*, 292 S.C. 466, 473, 349 S.E.2d 655, 659 (1986). Under these circumstances, a Court may direct or permit a

7. It was pursuant to the principle of deviation that the Court of Common Pleas of Philadelphia rendered its approval of modifications to the famous Will of Stephen Girard. *See Girard Estate*, 27 Fiduc. 545 (1977). *See also Girard Will Case*, 386 Pa. 548, 127 A.2d 287 (1956), *reversed Pennsylvania v. Board of Trusts*, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); *Girard College Trusteeship*, 391 Pa. 434, 138 A.2d 844 (1958); *Girard Clarification Petition*, 423 Pa. 297, 224 A.2d 761 (1966).

trustee to accomplish acts that are unauthorized or even forbidden by the terms of the trust. *See South Carolina National Bank v. Bonds*, 260 S.C. 327, 341, 195 S.E.2d 835, 842 (1973) (citing Restatement (Second) of Trusts § 381(d)).[8]

The burden of proof is always on the party seeking the deviation because in the case of "an express trust, favorable presumptions arise, and the burden of proof is on the party disputing its validity or terms." 89 C.J.S. Trusts § 66, at 845. *See DiLucia v. Clemens*, 373 Pa.Super. 466, 472, 541 A.2d 765, 768 (1988). Appellant argues that it should have prevailed below because the evidence offered was "uncontradicted," and the proposed charges were "approved" by the Attorney General. Such an argument has no foundation in law. The mere fact that evidence is uncontradicted does not automatically imbue that evidence with sufficient weight to sustain one's burden of proof. *See In re Archer's Estate*, 363 Pa. 534, 536, 70 A.2d 857, 859 (1950); *Carl v. Kurtz*, 255 Pa.Super. 198, 205, 386 A.2d 577, 580 (1978). Additionally, although the law requires the participation of the Attorney General's Office in any proceeding to modify the terms of a charitable trust, *Little's Estate*, 403 Pa. 534, 170 A.2d 106 (1961), appellant cites no support for the proposition that the Court is bound by the position espoused by the Office of the Attorney General, and a reviewing judge must exercise his or her independent power of review. *See* 20 Pa.C.S.A. § 3323.

In this case, appellant fell woefully short of satisfying its burden in demonstrating the *necessity* for access of six days per week, or the tenfold increase in the admission fee.[9] At the hearing before Judge Ott, appellant failed to produce any reliable evidence concerning the true financial picture of the foundation: appellant did not produce any recognizable financial statements, bank statements, tax returns, budgets or

**8.** The application of this doctrine to a variety of different factual situations has been discussed at length in the companion appeal to this case and we need not reproduce it here. *See In re Barnes Foundation; Estate of Violette de Mazia, supra.*

**9.** These specifics were not contained within the original petition but were testified to by the Foundation President.

audited reports. Instead, it offered one unsubscribed exhibit containing alleged expenses which, though received without objection, was nonetheless hearsay and of questionable weight. Appellant also introduced oral representations by its President which were very general in nature, and were not indicative of a true financial picture of the Foundation.[10]

**10.** For instance, the President of the Foundation could not testify with assurance regarding the size of the Foundation's annual operating budget. The following exchange is indicative of the lack of specificity of the Foundation President's testimony:

[COUNSEL FOR FRIENDS OF THE BARNES FOUNDATION]:

Q. Mr. Glanton, did I understand you to say yesterday in your testimony that operating costs at the Barnes had run to 1.2 million dollars in 1993—excuse me, they had at some point in time reached 1.2 million dollars? Maybe I misunderstood the testimony.

[FOUNDATION PRESIDENT:]

A. I don't know if you did or not. Yes, I think it's—I'm just trying to—

Q. Is that what you anticipated or is that what has happened in the past?

A. We're looking at a budget of about one point—I would say 1.4, five million dollars.

THE COURT: This year or next year?

THE WITNESS: This year, I would have to really get the budget and—

THE COURT: When you say that, you are talking about a number for this year or is that what you believe the number is for—

THE WITNESS: Number for this year probably is 1.3, I would think. I'm not sure. But I need the budget.

THE COURT: You're on a fiscal calendar?

THE WITNESS: Fiscal.

THE COURT: So when you say 1.3 for this, are you talking July 1, '95, through June 30—

THE WITNESS: I'm sorry. We're on a calendar-year budget. It's 1.3 million dollars. That's rough.

THE COURT: For this year?

THE WITNESS: Yes, approximately. I mean, I got the budget, I believe, in my briefcase, which I can get and tell you what it is.

THE COURT: Okay.

THE WITNESS: I just don't want Mr. Aker to come back and say, oh, he said this and—

BY [COUNSEL FOR FRIENDS]:

Q. I'm trying to remember what you said yesterday. I thought you said 1.2 million yesterday.

A. I said 1.1, 1.2 or 1.3 million, yes.

Q. The record will show what it shows.

A. Right.

N.T. September 14, 1995, at 59–61. Subsequently, when the Foundation President was asked by the Court about the Foundation's operating budget, he gave the following response:

This lack of specificity was an obvious source of frustration for Judge Ott and during the second day of the two-day hearing, he was compelled to remark:

I've got to tell you, this summary of what you say it is and then a rambling response which is absolutely inspecific, doesn't tell me a thing. I mean, it's not the way you do examination of a witness.

Day and a half, and I have about as many specifics as I could have gotten in twenty minutes of concise, succinct questioning. That's how much I've got out of a day and a half.

N.T. September 14, 1995 at 88–89. However, despite this remark, appellant failed to offer more detailed information regarding the financial situation of the Foundation. On the record it appears to this Court that Judge Ott was correct in his grant of relief; and his decision on fees and access should not be overturned.

Finally, we are compelled to remark that as a result of a variety of occurrences, the following sources of income are now available to the Barnes Foundation which were not available previously.

1. By virtue of the decision of Judge Ott in this case the Trustees of the Barnes Foundation have been freed of the investment restrictions contained in the indenture and now expect a greater return on the endowment investments.

2. By virtue of our decision in the companion case to this appeal, the Foundation will receive 2.75 million dollars over

THE WITNESS: Basically, we have a budget, but the budget doesn't mean anything because we have all this litigation, we have all these contingencies. We can't have any kind of certainty about our life. And so what we do and what we have done this past—we thought, for example, we would get the litigation settled with the de Mazia Trust. There are asterisks and footnotes and everything.

At any rate, what we did is pass a continuing resolution, which in effect becomes our budget. There is a budget. That budget is presented. It's discussed. And the authority pursuant to which the Foundation spends its money is on a continuing resolution by the board.

N.T. September 14, 1995 at 109–10. As noted above, neither the budget, nor a record of the continuing resolutions, was produced.

the next several years from the Trust of Violette de Mazia. *See In re Barnes Foundation; Estate of Violette de Mazia, supra.*

3. By virtue of this Court's grant of interim relief, the Barnes Gallery was permitted to remain open for the months of July and August in order to participate in the international exhibit of the works of Paul Cezanne presented by the Philadelphia Museum of Art.

4. By virtue of our present decision permitting fund raising events on the premises, the Foundation will be permitted to expand their fund raising activities.

Additionally, we note that at the time of the hearing, the Foundation had a pending petition before the Court of Common Pleas of Montgomery County seeking relief from the restrictions which Judge Stefan had placed on the proceeds which the Foundation had received from the world tour of the Barnes Collection. These proceeds approximated 5.5 million dollars. N.T. September 13, 1995, at 104. Depending on the relief granted, the Foundation may obtain additional operating funds dedicated to day to day maintenance and expenses.[11]

Thus, the Barnes Foundation may lie in a position to be able to maintain funds to carry out its mandate of education and public accommodation without any further increase in public access or increased fees. However, nothing in this opinion should be construed as prohibiting a future application to the Court of Common Pleas based on some subsequent events which would demonstrate a necessity for a further deviation from the terms of the indenture.

Accordingly, the decree of the Court of Common Pleas is affirmed in part and reversed in part. Jurisdiction relinquished.

---

**11.** The Foundation also stands to benefit from the proceeds of a pending C.D.–ROM disc and a book produced by Alfred E. Knopf, Inc. *See* N.T. September 13, 1995, at 98.