J-E02006-14

2014 PA Super 203

| | |
|---|---|
| RE: IN THE MATTER OF ESTATE OF GEORGE MCFADDEN, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: RANDOLPH HARRISON, ROBERT C. HARRISON, CO-TRUSTEES AND BENEFICIARIES, AND RANDOLPH HARRISON, JR., BENEFICIARY OF THE TRUST UNDER WILL OF GEORGE MCFADDEN F/B/O THE DESCENDANTS OF EMILY B. STAEMPFLI | No. 2872 EDA 2012 |

Appeal from the Decree of August 14, 2012
In the Court of Common Pleas of Delaware County
Orphans' Court at No.: 0028-1931

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, J., SHOGAN, J.,
ALLEN, J. OTT, J., WECHT, J., STABILE, J., and JENKINS, J.

OPINION BY WECHT, J.:                    **FILED SEPTEMBER 18, 2014**

The above-captioned Appellants challenge the orphans' court's August 14, 2012 decree that the residuary trust (the "Trust") contained in the will (the "1930 Will") of George McFadden ("Decedent")[1] terminated on or about February 21, 2012, twenty-one years after the death of Decedent's last surviving child, Emily Staempfli.  The orphans' court found that Ms. Staempfli was the measuring life for purposes of the Trust.  We reverse.

_____

[1]    This is at least the third time that a controversy related to the will of Decedent has come before the appellate courts of this Commonwealth. **See In re McFadden's Estate**, 112 A.2d 148 (Pa. 1955); **In re Girard Trust Co.**, 23 A.2d 454 (Pa. 1942).

The orphans' court has provided an admirably thorough, almost Genesis-like account of the genealogy of those among Decedent's progeny whose interests are implicated in one way or another by the interpretation of the Trust. *See* Orphans' Court Opinion ("O.C.O."), 8/14/2012, at 8-11. As well, the orphans' court has provided a prodigious and detailed rendition of other trusts spawned by the Trust, the trustees associated with those trusts, and their respective positions and arguments relative to the Trust's termination. *See id.* at 4-7.

Appellants here raise only one overarching question, as to which there are only two possible answers: Whether the orphans' court erred in determining who among three candidates constituted or constitutes the measuring life for purposes of the termination and distribution of the Trust principal. In resolving this question, our discussion proceeds as follows: First, we review the rule against perpetuities. Thereafter, we scrutinize the Trust's perpetuities clause and specify the candidates for the measuring life, excluding the many descendants of Decedent mentioned by the orphans' court who are irrelevant to our examination. Finally, we consider Appellants' arguments,[2] and we decide this appeal.

Our Supreme Court has defined perpetuities as follows:

_____

[2] Appellees, including beneficiaries other than those among Appellants, have chosen not to file a brief with this Court. At this Court's request, Appellees' counsel attended our *en banc* session, but they did not present oral argument in this matter.

Perpetuities are grants of property, wherein the vesting of an estate or interest [is] unlawfully postponed; and they are called perpetuities not because the grant, as written, would actually make them perpetual, but because they transgress the limits which the law has set in restraint of grants that tend to a perpetual suspense of the title, or of its vesting.

*In re Newlin's Estate*, 80 A.2d 819, 822 (Pa. 1951). The applicable rule against perpetuities "prohibit[s] the creation of future interests or estates which . . . may not become vested within a life or lives in being at the death of the testator and twenty-one years thereafter." *In re Lockhart's Estate*, 159 A. 874, 876 (Pa. 1932).

More recently, this Court discussed the three-stage evolution of the rule, only the first two steps of which inform our analysis of the instant case:

The evolution of the rule against perpetuities in the area of class gifts has had three distinct developmental stages in Pennsylvania. The first stage began with the founding of Pennsylvania and lasted until 1929. During this period, Pennsylvania followed the early common[-]law rule against perpetuities[,] which then called for the remorseless application of the "possibilities test" to determine the validity of all future interests. Under this rubric, a future interest, such as a remainder in a trust to all great-grandchildren, was void if there was even the slightest possibility that it might vest beyond the permissible period of a life or lives in being plus twenty-one years.

The second stage of development was a transitional period which lasted from 1929 to 1947. During this time period, our Supreme Court attempted to eliminate some of the harsher results which occurred in the area of the class gifts under the common[-]law rule against perpetuities' "possibilities test" by adopting the doctrine of vertical separability. The doctrine of vertical separability held that valid remainders would be separated from void ones and given effect if it would not alter the overall testamentary scheme of distribution.

- 3 -

*In re Estate of Weaver*, 572 A.2d 1249, 1253 (Pa. Super. 1990) (citations omitted).[3,4]  It is important to note these two distinct stages of trust interpretation and application because, as discussed below, our analysis requires us to compare Decedent's 1928 Will (the "1928 Will") with the 1930 Will.  Decedent must be presumed to have known of the harsh results that might follow from providing in trust for beneficiaries defined as a class under the law in 1928.  Decedent must be presumed to have been equally aware that, in 1930, the separability test would protect against the risk that a substantial portion of the Trust would be voided simply because one or more members of a specified class might be ineligible to serve as lives in being or otherwise take under the Trust.  *See In re Mayer's Estate*, 137 A. 627, 629 (Pa. 1927) ("Testator, more than any one, knew the condition of his estate, and he must be presumed to have known the law."); *City of Philadelphia v. Davis*, 1 Whart. 490, 502 (Pa. 1836) ("[T]he testator must be presumed to know how the law stood at the time of making his will . . . .").

_____

[3]  The third stage, what we described in *Weaver* as "the modern era," commenced in 1947 with the passage of the Intestate, Wills and Estates Act of 1947, which adopted the "actualities test" to determine the validity of future interests.  *See* 572 A.2d at 1253.

[4]  It appears that *Lockhart* was decided based upon the approach to class gifts that applied during the first stage described in *Weaver*, while the instant Trust is subject to the less strict principles that arose during the second stage.  *Lockhart*'s statement of the overarching contours of the rule, however, suffices for our purposes.

Having set forth the legal background against which the current case must be resolved, we now review the sections of Decedent's 1930 Will that inform the question *sub judice*:

> ARTICLE FOURTH:    I give, devise and bequeath all the rest, residue and remainder of my estate, and I also give, devise and bequeath all estates or interests over which I have power of appointment . . . IN TRUST, for the following uses, to wit:
>
> * * * *
>
> (3)   . . . IN TRUST, as to all the rest, residue and remainder of my estate, . . . to pay and distribute the net income thereof as follows: [describing the first-priority distribution schedule of Trust income for Decedent's wife]. And . . . during the lifetime of my wife, IN TRUST, to receive and apply the balance of the net income of my estate as follows:  To pay monthly, as nearly as possible, in the proportion of two parts of the balance of the net income to each of my sons, and one part thereof to each of my daughters, living at the time of my death, **or to the respective issue living at the time of my death of a deceased son or daughter, such issue being entitled to their parent's share of income, for and during the life of each of such children or issue of a deceased child living at the time of my death**. . . .
>
> **Upon the death of each child of mine living at the time of my death, and upon the death of each of the issue living at the time of my death of a deceased child of mine**, to pay the income of such child or issue of a deceased child, in the proportions above provided, meaning thereby that whenever a descendant of mine shall die leaving male and female children, the income shall be divided in such a way that the males shall receive twice as much income as the females, to and among the child or children of such child or issue of a deceased child, per stirpes and not per capita, **for the period of twenty-one years after the death of the last survivor of the children and issue of deceased children of mine living at the time of my death**.
>
> * * * *

And IN TRUST, **upon the expiration of the period of twenty-one years after the death of the last survivor of the children and issue of deceased children of mine living at my death**, to pay over to my descendants, per stirpes, a proportion and division of the principle of my residuary estate equal to the proportion and division of income hereinbefore provided and directed for my children or issue of deceased children, namely, the proportion of two (2) shares for each male and one (1) share for each female.

It being my intention that the income from my residuary estate shall be paid in the proportions of two parts to my sons **and their issue and descendants**, and one part to my daughters **and their issue and descendants**, per stirpes; that the same plan shall be followed in the division of income among the male and female children of my children **and their issue**; and that the principle of my residuary estate shall be divided in the same proportions.

1930 Will at 2-7 (emphasis added to highlight language pertinent to our analysis).

The most critical provisions are those that address the rule against perpetuities. In relevant part, that language provides for the distribution of the Trust principal "upon the expiration of the period of twenty-one years after the death of the last survivor of the children and issue of deceased children of mine living at my death." **Id.** at 6. We join Appellants and the orphans' court in their assessment[5] of this language as ambiguous.

_____

[5] That being said, we share Appellants' opinion that, while the orphans' court stated that the language is ambiguous, its ultimate resolution of the case is difficult to construe as having been based upon that proposition. **See** Brief for Appellants at 32. **Compare** O.C.O. at 12 (noting that it directed a hearing solely to resolve the ambiguity) **with** O.C.O. at 21 (determining that its interpretation was "the only reasonable interpretation," reciting strictly textual observations). The orphans' court effectively ruled
*(Footnote Continued Next Page)*

Either of the following two interpretations of that language is reasonable: (1) That the life in being whose death would trigger the twenty-one year perpetuities count-down was that of whomever among Decedent's children, all of whom were alive at the time of his death, survived his or her siblings; or (2) That the life in being whose death would trigger that count-down was whichever one of Decedent's two grandchildren who were alive at his death survived the other. The first interpretation stems from the proposition that the issue of one of Decedent's children would become the measuring life only if the parent of the issue in question predeceased the Decedent. The second is based upon the contrary proposition that the issue of a child would become the measuring life simply for being alive at the time of Decedent's death, irrespective of whether that issue's parent (Decedent's child) was alive at the time of Decedent's death. The answer hinges on the meaning of the phrase "the last survivor of the children and issue of deceased children of mine living at my death."

The orphans' court chose the former interpretation, and consequently ruled that the Trust terminated on or about February 21, 2012, twenty-one years after the death of Emily Staempfli, the last of Decedent's children to die, with the principal subject to immediate distribution amongst surviving beneficiaries as specified by the 1930 Will. If the latter interpretation were

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

that the language alone compelled its ruling, rather than the suite of non-textual factors typically used to resolve ambiguities in will language.

the case, however, termination would occur twenty-one years after the death of the survivor of the two grandchildren (each the issue of one of Decedent's children) who were alive at Decedent's death. Both grandchildren in question were alive at the time of the orphans' court's ruling; if the survivor of those grandchildren is the measuring life, then the Trust would terminate at some time in the future, twenty-one years after the death of the survivor of those two grandchildren.[6]

The orphans' court's determination, and our review of it, are governed by the following standards:

> *In Houston Estate*, 201 A.2d 592, 595 (Pa. 1964), the Court, quoting from prior decisions, said: * * * "It is now hornbook law (1) that the testator's intent is the polestar and must prevail; and (2) that his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts; and (3) that technical rules or canons of construction should be resorted to only if the language of the will is

---

[6] The Trust's satisfaction of the rule against perpetuities is not disputed in this case. Because the greater duration of the Trust argued for by Appellants still would occur within twenty-one years of the end of the surviving grandchild of the two grandchildren who were alive at the time of Decedent's passing, the Trust does not violate the rule. *Cf. Stephens v. Dayton*, 70 A. 127, 128 (Pa. 1908) (finding that a trust conformed to the rule against perpetuities because, "In no contingency . . . can the trust be extended beyond the life of a surviving grandchild who was living at his grandfather's death"). We set forth at length the history of the rule above because the transition between the first and second stage of development, as set forth in *Weaver*, *supra*, occurred between Decedent's 1928 and 1930 Wills, and, as discussed below, is as likely to have prompted the 1930 Will's changes to the 1928 Will's trust language as any of the other factors posited by the orphans' court and Appellants.

ambiguous or conflicting, or the testator's intent is for any reason uncertain: ***Dinkey's Estate***, 168 A.2d 337; ***Pruner's Estate***, 162 A.2d 626; ***Wanamaker's Estate***, 159 A.2d 201; ***Hope's Estate***, 159 A.2d 197.

***Estate of Moltrup***, 225 A.2d 676, 678 (Pa. 1967) (citations modified);

***cf. In re McFadden's Estate***, 112 A.2d 148, 150 (Pa. 1955) (hereinafter,

"***McFadden II***") ("All rules and canons of construction are but a means to

an end – namely, to ascertain and determine testator's intent . . . . When

the intention of the testator can be ascertained by an examination of his

entire will from the vantage seat of the testator's armchair * * * technical

rules or canons of construction are unnecessary . . . ." (quoting

***In re Edmunds' Estate***, 97 A.2d 75, 80 (Pa. 1953)) (asterisks in

***McFadden II***)). When a will is ambiguous on its face, a court may consider

extrinsic evidence to glean the testator's intent. ***Estate of McKenna***, 489

A.2d 862, 867 (Pa. Super. 1985).

> In ***In re Estate of Rider***, 711 A.2d 1018 (Pa. Super. 1998), we set forth the following standards applicable to the interpretation of wills.

> * * * *

> When interpreting a will, we must give effect to word and clause where reasonably possible so as not to render any provision nugatory or mere surplusage. Further, technical words must ordinarily be given their common legal effect as it is presumed these words were intentionally and intelligently employed, especially where they are used by someone learned in probate law.

> * * * *

> ***Rider***, 711 A.2d at 1021 (quoting ***In re Estate of Harrison***, 689 A.2d 939, 943 (Pa. Super. 1997)).

* * * *

> One limitation to the foregoing is that "**[e]xtrinsic evidence of surrounding facts must only relate to the meaning of ambiguous words of the will. It cannot be received as evidence of testator's intention independent of the written words employed**." *In re Beisgen's Estate*, 128 A.2d 52, 55 (Pa. 1956).

*In re Shultheis*, 747 A.2d 918, 922-23 (Pa. Super. 2000) (citations modified; emphasis added). "Where words used might under a given construction lead to a result that is highly improbable, the court will lean toward a construction that will carry out the natural intention of the testator." *In re Trust Estate of Pleet*, 410 A.2d 1224, 1230 (Pa. 1980) (quoting *Mayhew's Estate*, 160 A. 724, 725 (Pa. 1932)).

Finally, the interpretation of a trust or a will presents a question of law. *In re Barnes Foundation*, 683 A.2d 894, 898 (Pa. Super. 1996). As such, our standard of review is *de novo*, and our scope of review is plenary. *In re Estate of Livingston*, 612 A.2d 976, 981 n.2 (Pa. 1992). Our analysis therefore is not confined by the decision of the orphans' court. *Barnes*, 683 A.2d at 898.

In interpreting the Trust to embody the shorter of the two available time limitations, the orphans' court appeared to rely heavily upon a small subset of the available extrinsic evidence, principally the intervention of the stock market crash of 1929 between the fashioning of Decedent's 1928 and 1930 Wills, and the differences between those wills. O.C.O. at 16-17, 20-21. Notably, the extrinsic evidence in question was used by the court not so

much to elucidate the language of the 1930 Will as to discern Decedent's intent generally, an interpretive practice disfavored under the rule enunciated in **Shultheis** and **Beisgen**, *supra*. However, the orphans' court ultimately appears to have relied more upon a review of the language of the 1930 Will and its overarching testamentary scheme than on the Great Depression-related factors the court nonetheless discussed at some length. **See** *supra* at 7 n.5.

The court began with the 1930 Will's language concerning the distribution of the balance of net income after the distribution of specific sums to Decedent's wife. The court emphasized that the language allocating such residual income to Decedent's children "or to the respective issue living at the time of my death of a deceased son or daughter, such issue being entitled to their parent's share of income," **see** 1930 Will at 5, indicated that such a grandchild would not share in income unless his or her parent had predeceased Decedent, an interpretation that, by itself, seems obvious. O.C.O. at 15-16. The orphans' court then drew the following broad conclusion:

> [Decedent] wanted to provide for his wife and children, but protect their inheritances by having the money held and managed by a corporate trustee . . .; two (2) partners in the firm in which he was a senior partner . . .; and his son . . . . The reason for the need to protect and preserve the Decedent's assets of his estate for the benefit of his family can be seen from the turbulent times affecting the Decedent in January of 1930, which is when he drafted his will.

*Id.* at 16.

- 11 -

In reinforcing this point, the orphans' court noted that the 1930 Will followed and superseded the 1928 Will, and that the two wills straddled the stock market crash of October 29, 1929. Both wills provided similarly for Decedent's wife and also included a similar residuary trust that provided for the distribution of income, and ultimately the principal, in the same two-to-one allocation between male and female issue, respectively. What the 1928 Will lacked that the 1930 Will included, however, was specific language concerning how long the Trust would last before its termination. To wit, only the 1930 Will included the life in being language at issue in this appeal; the 1928 Will did not.

The orphans' court reasoned as follows:

The intent of the Decedent becomes quite clear when the two (2) testamentary documents stand side by side. In the [1930 Will], the Decedent was expressly prescribing how long the [T]rust would operate to benefit his children and that would be for the lifetime of each of the Decedent's children or issue of a deceased child living at the time of the Decedent's death.

The generation of the Decedent's grandchildren could not be "entitled to their parent's share of such income" as long as their parents were alive at the time of the Decedent's death, since a child of the Decedent and that child's offspring cannot be entitled to the same share.

In the 1928 [W]ill, the termination provision . . . recites:

And IN TRUST, on the death of each child or grandchild of mine living at the time of my death, to pay over to the descendants per stirpes of such child or grandchild living at the time of my death a principal amount of my residuary estate, ascertained by and in the proportions and divisions of income hereinafter provided for each child or grandchild . . . .

The above-stated provision calls for a staggered dissolution of the trust. The [T]rust is gradually reduced or dissolved as a child or grandchild dies. The child or grandchild's proportionate share of the residuary estate is calculated and paid . . . .

The termination provision contained in the [1930 Will] calls for a uniform date for the dissolution of the [T]rust and distribution of the [T]rust assets, thereby [e]nsuring that a share of the residuary estate is not subject to turbulent market conditions that may cause a reduction in value because of the uncertain economy. The uniform date for dissolution evens the risk of loss between all beneficiaries.[7] Furthermore, the termination provision names two (2) classes of individuals[,] "children and the issue of deceased children living at the time of my death[.]" If the Decedent intended that the survivor of his granddaughters would be the measuring life, he would not have uttered the word "deceased[.]" To the contrary, the Decedent would have uttered "[]children and the issue of children living at the time of my death[" . . . .] *A fortiori*, the only reasonable interpretation is that the Decedent intended that the [T]rust established by [the 1930 Will] would terminate twenty-one (21) years after the death of his last surviving child if all of his children survived his death, which they did. The only reasonable interpretation, which would allow for the survivor [of the grandchildren alive at the time of Decedent's death] to be the measuring life would be if [one of their respective mothers, Decedent's daughters, predeceased Decedent].

O.C.O. at 19-21 (bracketed modifications added). Accordingly, the orphans' court ruled that the measuring life for purposes of the Trust's termination and the concomitant distribution of the Trust principal was that of the survivor of Decedent's four children, because all of them were living at the

_____

[7] In relying upon this inference, the orphans' court appears to opine – without support in the text of the 1930 Will or its overall scheme – that Decedent intended that all trust beneficiaries (rather than only some subset of beneficiaries) would experience a financial loss in the event that the Trust terminates during a negative financial cycle.

time of Decedent's passing. Consequently, the Trust terminated on or about February 21, 2012, twenty-one years after the death of Emily Staempfli, Decedent's last surviving child. This appeal followed.[8]

Appellants assert that "all indicia of [Decedent's] intent support the conclusion that he intended for the Trust to last for the maximum time then permitted by law." Brief for Appellants at 34 (capitalization modified).[9] Appellants assert that trust settlors typically craft perpetuities language to sustain the life of the trust as long as legally permissible. However, by using as the measuring life the last survivor of Decedent's children rather than the survivor of their issue alive at the time of Decedent's death, the orphans' court interpreted the 1930 Will to provide for an intermediate duration of the Trust rather than the greatest duration permissible by law. The court did so,

_____

[8] The orphans' court entered an order directing Appellants to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellants timely complied. Thereafter, the orphans' court entered a Rule 1925(a) opinion directing this Court's attention to its August 14, 2012 decree and opinion for purposes of explaining the orphans' court's reasoning.
   This appeal first was heard by a three-judge panel of this Court, which affirmed the trial court's decree on December 31, 2013. On March 13, 2014, this Court entered an order withdrawing its December 31, 2013 memorandum and granting Appellants' January 14, 2014 application for re-argument *en banc*.

[9] Our citations to Appellants' brief refer to its "Substituted Brief for Appellants on Reargument *En Banc*. While this brief departs in certain particulars from the brief originally submitted to this Court in furtherance of a three-judge panel's disposition, the arguments are materially the same. Hereinafter, we refer to Appellants' "Substituted Brief" as "Brief for Appellants."

Appellants emphasize, without any textual or extrinsic indicia that Decedent intended such an outcome. *Id.* at 34-35.

Appellants focus first on the language of the 1930 Will and the overarching scheme of distribution. Appellants emphasize that the scrivener took great care in the Will to specify precisely when certain will provisions were to apply. They invite this Court to examine the provision concerning the payment of income to beneficiaries found in the fourth article of the 1930 Will, together with the same article's perpetuities clause: The former provision indicated that income remaining after the payment to Decedent's wife of a prescribed allowance should be distributed to Decedent's children "living at the time of [his] death" or "the respective issue living at the time of my death of a deceased son or daughter, such issue being entitled to their parent's share of income." *Id.* at 36. "In order for a grandchild to be an initial beneficiary of income, he or she would have had to be issue of a son or daughter of [Decedent] who was 'deceased' **when the payments were to commence**." *Id.* at 37 (emphasis in original).

Appellants also note that subparagraph (3), in providing secondary beneficiaries who will benefit from the Trust "[u]pon the death of each child of mine living at the time of my death, and upon the death of each of the issue living at the time of my death of a deceased child of mine," anticipated "successive generations of beneficiaries," as did the subsequent reference to "the shorthand phrase," "whenever a descendant of mine shall die." Appellants argue that these allusions reflect Decedent's intent that the Trust

- 15 -

endure as long as the law in 1930 allowed. *See*, *e.g.*, 1930 Will at 7 (referring to "the division of income among the male and female children of my children **and their issue**" (emphasis added)).

Appellants next argue that this interpretation is consistent with the scheme of distribution, especially viewing the 1930 Will in tandem with the 1928 Will that it replaced. Appellants note that the 1928 Will provided for the distribution of various shares of that will's residuary trust to certain individuals' successors when those individuals died, resulting in the slow distribution and concomitant depletion of Trust assets over time. Brief for Appellants at 41-43. The 1930 Will, by contrast, provided for a single termination date upon which the entire principal would be distributed to those entitled to a share of it. To that end:

> [T]he Perpetuities Clause in the 1930 [W]ill . . . greatly lengthened the duration of the [T]rust. Rather than having each trust share end at the death of each initial beneficiary, the [1930 Will] described a class of potential measuring lives and provided that the actual measuring life would be that of the person who lived the longest. And then, in accordance with what Pennsylvania law allowed at the time to further lengthen the [T]rust's duration, the [Perpetuities] Clause provided that the [T]rust would last for 21 years after that measuring life expired.

*Id.* at 42. Thus, the overarching scheme of Trust distribution indicated that Decedent intended to give the Trust the longest duration then permissible under Pennsylvania law. *Id.* at 42-43.

Appellants find further support for their interpretation in the fact that the Trust neither allowed the trustees to invade the principal in their

- 16 -

discretion for the benefit of needy beneficiaries nor provided any power of appointment to any individual. *Id.* at 43-46. Appellants posit that Decedent's testamentary scheme, and the fact that much of the corpus of the Trust "consisted mainly of the value of [Decedent's law practice,] helps to explain [Decedent's] failure to provide for an invasion of principal." *Id.* at 44. In short, "[Decedent] was not a testator inclined to relinquish control sooner than he had to do so." *Id.* at 45.

Moving to the next *Moltrup* consideration, Appellants address the circumstances surrounding Decedent at the time he prepared his Will. They emphasize that Decedent was only fifty-six years old at that time and had just witnessed the 1929 birth of his first grandchild. Thus, while the orphans' court was correct that the stock market crash was a signal event that the preparation of the two wills straddled in time, so too was the birth of Decedent's granddaughter. Shortly thereafter, in the 1930 Will, Decedent identified grandchildren as potential measuring lives; they had not been mentioned as such in the 1928 Will, only implicitly as "issue." *Id.* at 46. As well, Decedent's 1930 Will reflected greater caution than its 1928 predecessor, for example by "plac[ing] new and more conservative restrictions on the investments that his trustees could make, in an effort to shield the [T]rust from severe disruptions in the securities markets." *Id.* at 47. Appellants continue: "There is *no* evidence that [Decedent] intended that the secure source of income that [the Trust] provided to his

descendants should last for any shorter period than the maximum duration the law allowed." *Id.* at 47-48 (emphasis in original).

Appellants also maintain that the prosperous endurance of his firm, George H. McFadden & Bro., was a priority for Decedent in the fashioning of the Trust. *See id.* at 43-44. For example, the 1930 Will provided that "[i]t [was Decedent's] desire that [his] sons shall each have the opportunity of becoming partners in the firm of George H. McFadden & Bro., or any copartnership successor thereto." 1930 Will at 7. To that end, the Trust authorized the trustees by mutual assent to loan Decedent's sons money against their share of the estate solely for use toward capitalizing any such partnership. However, that provision also called for the immediate maturity of the loan in the event the trustee determined that the partnership was "not profitable and free of gambling transactions" or was not conducting business in "a safe and conservative manner." *Id.* at 8. Appellants further note that a statement of testimony to be given in prior litigation concerning the 1930 Will made by Decedent's former partner, Edward Browning, Jr., established that Decedent's then-recent experience of the financial fall-out from the death of Decedent's father "had demonstrated to us the inconvenience of large withdrawals of capital belonging to the Estate of a deceased partner," leading Mr. Browning and another party to take out a $1 million life insurance policy on Decedent to hedge against precisely that "inconvenience." *See* Exhibit H-2, Memorandum for Trial in *McFadden v. United States*, Memorandum of Testimony to be given by Mr. Edward

Browning, Jr.[10]  As well, in another statement, the scrivener of the 1928 and 1930 Wills attested that, in 1930, Decedent had "practically his entire estate invested in the firm."  *Id.*, Memorandum of Testimony to be given by [John Hampton] Barnes.  That so much of Decedent's estate was wrapped up in the firm, Appellants posit, effectively necessitated, in the long-term interests of his surviving and future partners, that the principal of the estate remain undisturbed for as long as possible.

We begin our analysis by parting ways from what we believe to be the orphans' court's substantial reliance upon the Decedent's general use of the word "deceased" to modify "children" in the Trust's perpetuities clause.  As set forth above, the orphans' court concluded essentially that, by indexing the perpetuities clause to the death of the surviving child or issue of a **deceased** child, Decedent indicated that any grandchild of his who was alive at the time of Decedent's death would become the measuring life if and only if that grandchild's parent had predeceased Decedent.  The orphans' court underscored the fact that Decedent, had he wanted to extend the perpetuities clause to count any grandchild alive at the time of Decedent's death as a measuring life without regard to whether any of Decedent's

---

[10]    A federal district court opinion concerning the litigation in which these statements appeared as exhibits may be found at ***McFadden v. United Statese***, 20 F.Supp. 625 (E.D. Pa. 1937).

children then were alive, could simply have removed the word "deceased" from the language of the clause. O.C.O. at 20-21.

We agree that, taking the clause in isolation, this is a reasonable inference. Yet, we disagree that it is the **only** reasonable inference. Were we to base our determination strictly upon such conjectures, we would be bound to acknowledge that Decedent might just as readily (and perhaps more conclusively) have cured the ambiguity by modifying "deceased child" to read "child deceased at the time of my death" or "child who predeceases me," or other words to that effect. That various minor modifications to the language might militate in favor of one or the other outcome, however, is not dispositive, inasmuch as none of these observations emerges by itself as preferable to the others. Consequently, we must disagree with the learned orphans' court's view that the provision as worded is conclusive of the question.

We also find a textual nuance that neither the orphans' court nor Appellants clearly address, but which militates in favor of Appellants' view of the case. Specifically, in the income distribution-related provision, Decedent used the disjunctive "or" to separate Decedent's children from issue of Decedent's **deceased** children, underscoring that each of Decedent's grandchildren was in line for distributions only in the event that their respective parent, Decedent's child, was deceased. However, in connection with the perpetuities language, Decedent twice employed the conjunctive "and" to connect Decedent's children to issue of Decedent's children.

***Compare*** 1930 Will at 5 ("To pay monthly . . . the net income to each of my sons, . . . and to each of my daughters, living at the time of my death, **or** to the respective issue living at the time of my death of a deceased son or daughter . . . ." (emphasis added)) ***with id.*** at 6 (describing expiration of the Trust as occurring "upon the expiration of the period of twenty-one years after the death of the last survivor of the children **and** issue of deceased children of mine living at my death" (emphasis added)).

While we do not find this observation entirely dispositive either, it nonetheless favors Appellants' argument. Specifically, when it was unequivocally the case under clear aspects of the testamentary scheme that the issue of Decedent's child would only be relevant after the death of that child, as it was with regard to the distribution of Trust income, Decedent employed the word "or": Either the child received trust income, **or**, in the event that the child in question had died leaving issue, said issue would divide up Decedent's child's putative share on a *per stirpes* basis. Indeed, in addition to the earlier-mentioned linguistic variations that might have been employed to clarify that the last surviving child, rather than the last surviving grandchild, would be the measuring life under the circumstances of this case, use of "or" instead of "and" in the perpetuities clause arguably would have been yet another way to effectuate that result – this, for the same reason we observe in connection with the Trust's income distribution provisions, where the disjunctive "or" was necessary to avoid the incongruity of two classes of beneficiary appearing to be entitled to the same share of

the estate simultaneously. This aspect of the broader testamentary scheme, and particularly the fact that the variations in question apply to aspects of the Trust itself, suggests that Decedent intended to extend the life of the Trust past the life of the survivor among any grandchildren living at the time of his death, regardless of whether that grandchild's parent predeceased Decedent.

Because these observations, while suggestive, are not conclusive, we must reach outside the text of the Trust and indeed the Will to seek further indicia of Decedent's intent in some of the same extrinsic factors that the orphans' court surveyed. However, we do so mindful that, as provided in **Shultheis** and **Beisgen**, *supra*, we may rely upon such considerations only to the extent that they inform the ambiguous **language** in question, not in some relatively unbounded effort to glean Decedent's broader intent.

We find two factors sufficient, in tandem with the above analysis, to dispose of this case. As noted, *supra*, under the "possibilities test" that governed the 1928 Will, if a class of persons of whom some but not necessarily all were lives in being at the time of the decedent's death, then, if it was reasonable to anticipate under the language of a trust the addition of putative measuring lives who were not lives in being at the time of the decedent's death, the trust was invalid as to **all** members of that class. **See Weaver**, 572 A.2d at 1253. However, in 1929, the rigor of that principle was relaxed by the adoption of the "vertical separability" test, whereunder only the members of the class as to whom the Trust was rendered invalid

would be excluded from a share of the Trust, but those class members as to whom the Trust remained legally enforceable would remain beneficiaries as per the terms of the Trust. *Id.* This more lenient test would apply so long as the testator's overarching testamentary scheme would not be violated by voiding only the offending provisions as to the issues arising from the presence of certain individuals in the problematic class or classes.

The 1928 Will's trust provisions trenchantly avoided relying upon a class to determine perpetuities, and indeed carefully specified that distributions of principal be made piecemeal as such distributions were called for by the death of various beneficiaries. In so doing, the trust in the 1928 Will recognized the *per stirpes* distribution of trust income and principal across several specified classes, while ensuring that no member of any class could run afoul of the then-applicable rule against perpetuities. Perhaps the language was more cautious than necessary under the applicable rule, but it appears to us that it was designed to hedge against the eventuality, especially when viewed against the very different perpetuities language of the revised Trust specified in the 1930 Will.

Although, as noted, the language of the 1930 Will's Trust clearly passed muster under the severability test, it pushed further toward class-based distributions of interest and principal and, in extending its life twenty-one years past a measuring life (without regard to which life is deemed the measuring life), provided for a trust of longer duration than the 1928 Will's trust provision would have ensured. Moreover, under the 1930 Will's Trust,

all principal would remain in the Trust until its termination, rather than dissipating over time in various shares, maximizing the duration of the distribution of income to the specified descendants, as well as its effect upon the health of Decedent's firm, George H. McFadden & Bro., which comprised a substantial portion of Decedent's estate.

These observations militate in favor of the conclusion that Decedent intended that the Trust endure as long as was permissible under the law, which, at the time of the 1930 Will's drafting, with one grandchild already in being, would have been twenty-one years after the death of that grandchild or the last death among any other grandchildren born before Decedent's death. A similar intent, moreover, is implied by Decedent's references not just to his grandchildren, but to **their** issue as well, beneficiaries who were remote for him to contemplate at the time.

Against these indicia of Decedent's intent to extend the Trust for as long as the then-applicable law allowed, we must measure those considerations favoring the alternative conclusion reached by the orphans' court. The orphans' court's speculations regarding tax consequences, market instability, and the Decedent's putative intent to weather the financial storm, but only unto the death of his last surviving child plus twenty one years, not to the end of the succeeding generation, are unconvincing. First, these considerations simply do not speak directly to the ambiguity of the language itself, as *Schultheis* and *Beisgen* prescribe. Moreover, they appear arbitrarily chosen among many competing intents

that might have arisen in the turbulent financial circumstances that existed in 1930. While we certainly acknowledge those conditions, and while Decedent obviously would have drafted his 1930 Will in the gloomy light cast by those circumstances upon his financial affairs, we have no tangible evidence of what his responsive intent might have been beyond what we can glean from the testamentary scheme as reflected in the language of the 1930 Will. Ultimately, we believe that the case for using the surviving child of Decedent as the measuring life rests almost exclusively upon the orphans' court's assertion that the language that it elsewhere called ambiguous actually was clear due to the use and placement of the word "deceased" to modify "child." However, for the reasons set forth above, we find this approach unpersuasive.

Pennsylvania law is clear that, in interpreting wills, "the law will impute to the testator's words such meaning as under all the circumstances will conform to his probable intention and be most agreeable to reason and justice." **McKenna**, 489 A.2d at 865 (quoting **Umberger Estate**, 87 A.2d 290, 293 (Pa. 1952)). Our conclusion necessarily is less certain than it might be because the text of the residuary Trust established in the 1930 Will is at best baroque and at worst byzantine. However, we believe that those indicia that we do glean from the testamentary scheme evident on the face of the 1930 Will and the above-cited extrinsic factors suggest that the most just, reasonable interpretation, and that which best reflects Decedent's probable intention, is that Decedent intended to perpetuate the Trust for as

long as possible. Unless one embraces the orphans' court's selectively textual interpretation of plainly ambiguous language, there is no clear reason to infer that Decedent intended the middle path – extending the Trust for a significant duration, but not a duration as long as the law allowed – especially in light of the fact that the changes made to the Trust between the 1928 Will and the 1930 Will signaled Decedent's intent specifically to acknowledge his newly-born grandchild as a relevant life in being for perpetuities purposes and his intent to avail himself of the perpetuities law of the day to extend the life of the Trust past the life of his children.

For the foregoing reasons, we conclude that Decedent intended that the measuring life for the residuary Trust in his 1930 Will would be that of the surviving grandchild among any grandchildren alive at the time of Decedent's death. Accordingly, the orphans' court erred as a matter of law in concluding otherwise.

Decree reversed. Case remanded. Jurisdiction relinquished.

Ford Elliott, P.J.E., Bowes, J., Allen, J., Ott, J., and Stabile, J. join the opinion.

Shogan, J. files a dissenting opinion in which Bender, P.J.E and Jenkins, J. join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/18/2014</u>