J-A01004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  DONALD BANY REVOCABLE LIVING TRUST, MARY LEE METER, SUCCESSOR TRUSTEE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  MARY LEE METER | |
| | No. 336 MDA 2021 |

Appeal from the Order Entered February 26, 2021
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
1420-0301

BEFORE:  LAZARUS, J., NICHOLS, J., and KING, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 29, 2022**

Mary Lee Meter ("Meter") appeals from the order, entered in the Court of Common Pleas of Centre County, Orphans' Court Division, granting a declaratory judgment in favor of Christopher R. Snyder ("Snyder"), declaring him to be a beneficiary of the Donald Bany Revocable Living Trust ("Trust"), and concluding that he has standing to compel an accounting by Meter in her capacity as trustee.  After careful review, we vacate the order and remand for further proceedings consistent with the dictates of this memorandum.

By instrument dated July 9, 2015, Donald Bany ("Settlor") created the Trust, designating himself and Meter as co-trustees during his lifetime.  Settlor died on January 4, 2017, leaving Meter as sole trustee.  Settlor's will, executed on July 13, 2015:  gave his personal property to Meter; exercised a power of appointment over the Ida D. Bany Trust in favor of Meter; and gave the

residue of Settlor's estate to the Trust. Meter was named as Settlor's personal representative.

Relevant to the matter at hand, Article 1 of the Trust provides as follows:

> I am not married and have no children. I am a citizen of the United States. **My descendants shall be limited to Mary Lee Meter, my niece, her children and her husband Jeffrey J. Meter and my nephew Christopher Roger Snyder**.

Trust, 7/9/15, at Article 1 (emphasis added).

Article 5.2 of the Trust disposes of the residue and provides, in relevant part, as follows:

> 5.2   Residuary Trust Estate.   The Trustee shall divide the remaining Trust Estate into separate shares for my descendants, *per stirpes*.  The Trustee shall hold each beneficiary's share as a separate trust under Article 6. **If I have no descendants living at my death, the Trustee shall distribute the remaining Trust Estate to Mary Lee Meter and to Jeffrey J. Meter and Christopher Roger Snyder in the event Mary Lee Meter does not survive me**[.]

*Id.*, at Article 5.2 (emphasis added).

On July 6, 2020, Snyder filed a petition to show cause why Meter should not be directed to file an account of her administration of the Trust. On August 31, 2020, Meter filed an answer to the petition, as well as a counterclaim seeking a declaratory judgment that Meter is the sole beneficiary of the trust and that Snyder "has no claim to any remaining trust assets." Counterclaim for Declaratory Judgment, 8/31/20, at ¶ 2. On October 20, 2020, the Orphans' Court issued an order directing, *inter alia*, that Meter file an account of her administration within 45 days. On December 4, 2020, Meter filed an

amended counterclaim in which she expanded upon her allegations, and to which she attached copies of earlier wills, executed by Settlor in 1974 and 2013, that excluded Snyder as a beneficiary. She also attached to the amended pleading a copy of an email from the scrivener of the Trust, Gerald Nowotny, Esquire, in which he explained that it was the Settlor's intent that Meter "would be the only beneficiary of the trust." Amended Counterclaim, 12/4/20, at Exhibit A.

Following a status conference, on January 7, 2021, the court issued an order again directing Meter to file an account and ordering the parties to file briefs on the issue of whether Snyder is a beneficiary of the Trust. Both parties submitted briefs, and Meter filed her account on January 21, 2021. In her brief, Meter argued that the terms of the Trust—specifically, Articles 1 and 5.2—were "contradictory," "paradoxical," and "nonsensical," and, therefore, ambiguous. Respondent's Brief in Opposition, 1/15/21, at [3, 4]. Accordingly, Meter argued that the court should turn to extrinsic evidence—specifically, the Settlor's prior wills and the testimony of the scrivener—to "cut" the "Gordian knot presented by the operative language in [the T]rust[.]" *Id.* at [6].

On February 26, 2021, without holding a hearing, the court issued an opinion and order in which it concluded that the Trust was not, in fact, ambiguous. In particular, the court "[did] not interpret the [final] sentence of Article 5.2 to create ambiguities in [Settlor's] intent[;] instead the [c]ourt [found] the sentence to be the result of boiler plate [*sic*] language written by a lackadaisical scrivener." Orphans' Court Opinion, 2/26/21, at 4. The court

- 3 -

went on to state that "[e]ven assuming, *arguendo*, that extrinsic evidence was necessary, the documents provided by [Meter] would not result in a different conclusion by the court" because any documents admitted as extrinsic evidence to elucidate the Settlor's intent "must be related to the trust." **Id.**, citing **In Re Blish Trust**, 38 A.2d 9 (Pa. 1944). The court concluded that

> [h]ere, the two documents related to [Settlor's] Trust are [Settlor's] 2015 will and the Trust Agreement itself. When viewing these together, both documents are consistent and neither establish[es] an intent on the part of [Settlor] other than for his residuary estate to pass to the Trust which, upon his death, was to then be separated into individual trusts for his named descendants.

Orphans' Court Opinion, **supra** at 4.

Meter filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Meter raises the following claims for our review:

> 1. Did the [Orphans'] Court err as a matter of law in determining that the trust instrument was unambiguous when the limitation of the class of "descendants" in one article of the trust is incompatible and irreconcilable with the instruction for distribution of the residuary trust in another article of the trust?
>
> 2. Did the [Orphans'] Court err as a matter of law in excluding extrinsic evidence of the settlor's intent when the language of the trust instrument is ambiguous and extrinsic evidence would aid in the interpretation of the ambiguous language of the trust?
>
> 3. Did the [Orphans'] Court err as a matter of law when it held that [Snyder] is a beneficiary of the trust, without resolving the ambiguity?
>
> 4. Did the [Orphans'] Court err as a matter of law when it held that [Snyder] has standing to compel [Meter] to file an account of her actions as trustee of the trust, when [Snyder] is not a

beneficiary of the trust and has no other basis to claim an interest in the trust?

Brief of Appellant, at 2.

"[T]he interpretation of a trust or a will presents a question of law. As such, our standard of review is *de novo*, and our scope of review is plenary." *In re Estate of McFadden*, 100 A.3d 645, 650 (Pa. Super. 2014) (en banc) (citations omitted).

Although Meter raises four issues, the resolution of the final three claims flows from our determination as to the first, i.e., whether the Trust is ambiguous. Accordingly, we begin by setting forth the principles that guide us in interpreting the Trust.

> When interpreting the provisions of a trust, the polestar in every trust is the settlor's intent and that intent must prevail. *In re Benson*, [615 A.2d 792, 794 (Pa. Super. 1992)]. The settlor's intent:
>
>> must be gathered from a consideration of (a) all the language contained in the four corners of his [trust] and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his [trust] and (d) the existing facts;. . . technical rules or canons of construction should be resorted to only if the language of the [trust] is ambiguous or conflicting or the [settlor's] intent is for any reason uncertain.
>
> *In re McFadden*, 705 A.2d 930, 931 (Pa. Super. 1998). Furthermore, the rules for determining a settlor's intent are the same for trusts as for wills. *Id.* (quoting *In re Trust Estate of Pleet*, [] 410 A.2d 1224, 1228 ([Pa.] 1980)).

*In re Trust of Hirt*, 832 A.2d 438, 448 (Pa. Super. 2003).

"[A] trust instrument must be construed so as to give meaning and effect to every word and . . . a construction [that] renders any of the words

- 5 -

futile or nugatory must be rejected[.]" ***In re Deed of Trust of McCargo***, 652 A.2d 1330, 1337 (Pa. Super. 1994), citing ***Estate of Rush***, 626 A.2d 602, 604 (Pa. Super. 1993). When a court charged with construction of a trust cannot feel confidence in distributing the estate by reference to that document alone, then it is proper and necessary to refer to sources beyond the instrument itself. ***Matter of Estate of Rudy***, 478 A.2d 879, 882 (Pa. Super. 1984), citing ***Soles Estate***, 304 A.2d 97, 99 (Pa. 1973). "It has long been held in Pennsylvania that examination of prior wills is helpful in determining the intention of the testator." ***Estate of Schwarzbarth***, 466 A.2d 1382, 1385 (Pa. Super. 1983). ***See also Williamson's Estate***, 53 A.2d 869, 871 (Pa. Super. 1947) ("Where there is such an ambiguity in a [w]ill as to justify consideration of extrinsic evidence[,] former [w]ills executed by testator may be considered to throw light on his intention."). In addition, the testimony of the document's scrivener may be admissible to elucidate the settlor's intent. ***See Estate of McKenna***, 489 A.2d 862, 867 (Pa. Super. 1985) (declarations of testator's intent are admissible for purposes of interpretation).

Here, Meter alleges that the Trust, as written, is ambiguous and, thus, the Orphans' Court erred in refusing to consider extrinsic evidence to clarify Settlor's intent. Specifically, Meter argues that that Settlor's use of the word "descendants" in Article 1 renders Article 5.2 ambiguous. In Article 1, Settlor states: "I am not married and I have no children. . . . My descendants shall be limited to [Meter], my niece, her children and her husband Jeffrey J. Meter [("Jeffrey")] and my nephew [Snyder]." Trust, ***supra*** at Article 1. In Article

5.2, Settlor directs the distribution of the trust residue, in relevant part, as follows:

> The Trustee shall divide the remaining Trust Estate into separate shares for my descendants, *per stirpes*. . . . If I have no descendants living at my death, the Trustee shall distribute the remaining Trust Estate to [Meter] and to [Jeffrey] and [Snyder] in the event [Meter] does not survive me[.]

*Id.* at Article 5.2.

Meter argues that "the trial court never considered whether Article 1 was drafted in error" and, instead, simply concluded that its language "clearly articulates [Settlor's] intent for [Snyder] to be a rightful beneficiary of the . . . Trust" because Settlor "clearly described with particularity the persons he defines as his descendants." Brief of Appellant, at 15, quoting Orphans' Court Opinion, *supra* at 3. Meter argues that the word "limited" is not synonymous with the word "defined." Meter asserts that Settlor's "use of the word 'limited' applies where there is a larger class of individuals that qualify as [Settlor's] 'descendants' . . . but he intended to limit that larger class to only Meter, Meter's children, Jeffrey[,] and Snyder." Brief of Appellant, at 15. However, because none of the named beneficiaries is actually included in that class of beneficiaries Settlor intended to "limit"—i.e., his "descendants"[1]—Article 1 is ambiguous. *Id.* at 16. Meter posits that "a more logical interpretation of

---

[1] Meter cites to the Merriam-Webster dictionary, which defines "descendant" as "one originating or coming from an ancestral stock or source." https://www.merriam-webster.com/dictionary/descendants (last visited March 17, 2022). Meter observes that neither Meter, Meter's children, Jeffrey, nor Snyder are "descendants" of Settlor under that definition.

Article 1 is that, because [Settlor] had no descendants, he intended to limit the **beneficiaries**" of the Trust to those individuals named. *Id.* (emphasis added). Meter asserts that the trial court's decision to treat the word "descendants" as defined to mean those individuals named, results in "a tortured and . . . bizarre result" when read in conjunction with Article 5.2. In particular, Meter illustrates that the insertion of the named "descendants" in Article 5.2 produces the following result:

> The Trustee shall divide the remaining Trust Estate into separate shares for **[Meter, Meter's children, Jeffrey, and Snyder]** *per stirpes*. . . . If none of [Meter, Meter's children, Jeffrey, and Snyder] are living at my death, the Trustee shall distribute the remaining Trust Estate to [Meter and to Jeffrey and Snyder] in the event Meter does not survive me.

*Id.* (emphasis added by Appellant; some brackets inserted). Meter argues that this reading of Article 5.2 is "patently absurd and impossible." *Id.* at 17.

Meter further argues that the court's conclusion that the final sentence of Article 5.2 was merely the result of a "lackadaisical scrivener" using "boilerplate language—and its consequent disregard of that sentence—is, itself, "a tacit admission by the [court] that the [Trust] is ambiguous and that the only way to resolve the ambiguity is to excise a substantial portion . . . of Article 5.2[.]" Brief of Appellant, at 17. Meter asserts that the court's decision is contrary to established Pennsylvania law, which requires courts to construe a trust instrument "to give meaning and effect to every word and that holds that a construction that renders any of the words futile or nugatory must be rejected." *Id.*, citing *McCargo Trust*, 652 A.2d at 1337.

- 8 -

Finally, Meter alleges that the court's interpretation of Article 1 to "re-define[e] the word [`]descendants[']" and to apply that definition to Article 5.2 creates additional ambiguities in that Article." Brief of Appellant, at 22. Specifically, Meter argues the following:

> Article 1 states "[m]y descendants shall by **limited to**" Meter, her children, Jeffrey, and Snyder, and thus purposefully excludes Snyder's children[.] Article 1 also excludes Meter's grandchildren and more remote descendants[,] and Snyder's descendants [are excluded] completely. These exclusions in Article 1 render the Article contrary to the language in Article 5.2, which directs that [Settlor's] residuary estate be distributed to his "descendants, **per stirpes**." []
>
> How is "*per stirpes*" to be interpreted in Article 5.2 if, under the [Orphans'] Court's interpretation of the [Trust], "descendants" are defined only as Meter, Meter's children (and not her grandchildren or more remote descendants), Jeffrey, and Snyder (but not Snyder's descendants at all)? The language of Article 1, as interpreted by the [Orphans'] Court, is contrary to either of the senses in which the term "*per stirpes*" may be used.[2] No distribution may be made to Snyder's descendants "*per stirpes*" when his descendants have been purposefully excluded and[,] thus[,] cannot be "substitute legatees." Similarly, how could distributions be made to Meter's children "*per stirpes*" when her grandchildren and more remote descendants are similarly excluded? Thus, by trying to force the [Trust] into a document that says what the [Orphans'] Court believes it should say[,] rather than acknowledging the ambiguity and considering extrinsic evidence of [Settlor's] intent, the [Orphans'] Court, through its interpretation and re-writing of the [Trust], has created additional ambiguities within that instrument.

_____

2 "Ordinarily, the words `*per stirpes*' are used with respect to substitutional gifts to substituted legatees in the event of the death of a primary legatee or legatees, yet the expression `*per stirpes*' may be used in two different senses[:] it may refer, first, to a `taking by right of representation,' and second, to a taking `collectively by families and not equally as individuals[.]'" **In re Grimm's Estate**, 275 A.2d 349, 357 (Pa. 1971) (citation, quotation marks, and brackets omitted).

*Id.* at 22-24 (emphasis added by Appellant).

In his brief, Snyder declines to address the specific arguments raised by Meter. Rather, he asserts, baldly, that "the trust provision naming [Snyder] as a residuary beneficiary is unequivocal, such that resort to extrinsic evidence is improper." Brief of Appellee, at 5-6. Addressing the "inartful language" used by the Settlor in the final sentence of Article 5.2, Snyder asserts, without citation to authority, that "the second residuary term[, i.e., the final sentence of Article 5.2,] does not apply because it solely becomes effective in the contingent event that the settlor left no living descendants, a possibility that did not in fact occur." *Id.* at 12.

We agree with Meter that Settlor's use of the word "descendants" renders the terms of the Trust "manifestly ambiguous," *McCargo Trust*, 652 A.2d at 1335, and requires that the court resort to extrinsic evidence to ascertain Settlor's true intent. If, as the Orphans' Court concluded, Settlor's descendants are "defined" in Article 1 to mean only Meter, Meter's children, Jeffrey, and Snyder, the alternative disposition of the residuary estate under the last sentence of Article 5.2 is rendered absurd and impracticable, directing distribution be made to contingent beneficiaries who would all have predeceased the Settlor.

Similarly, we concur with Meter that Settlor's use of the phrase "*per stirpes*" creates an additional ambiguity when Articles 1 and 5.2 are read together. If, as the Orphans' Court found, Article 1 "defines" Settlor's descendants as only Meter, Meter's children, Jeffrey, and Snyder, his use of

the phrase "*per stirpes*" in the first sentence of Article 5.2 is nonsensical, as, by the terms of Article 1, all of Snyder's descendants—and Meter's descendants more remote than her children—are excluded from taking under the Trust.

Our decision finds support in **McCargo Trust**, **supra**. There, the ambiguity was created by the settlor's use of the word "issue" throughout the trust document. The parties disputed whether the word "issue" was "employed in its technical sense, including all persons, of multiple generations, who have descended from a common ancestor," or whether the word was used "in a more limited sense . . . to include only the next generation." **Id.** at 1332. The Court, faced with "an intrinsic dichotomy," concluded that "there is simply no way to discern the meaning of 'issue,' as it is used in the Trust Agreement, relying solely upon the language of the document itself." **Id.** at 1334. Accordingly, the Court found that extrinsic evidence was necessary to determine the settlor's intent.

Likewise, here, there is no way to reconcile the meaning of the word "descendants," as it is used by the Settlor in Articles 1 and 5.2, by looking solely to the language of the document itself. Accordingly, it was the obligation of the Orphans' Court to look to extrinsic evidence to ascertain the true intent of the Settlor.[3]

_____

[3] As noted above, the Orphans' Court concluded that, even if it had considered the extrinsic evidence submitted by Meter, it would not have reached a
*(Footnote Continued Next Page)*

- 11 -

In straining to avoid the need to consider extrinsic evidence, the Orphans' Court—contrary to well-established Pennsylvania law—simply excised the final sentence of Article 5.2, attributing any confusion caused thereby to "boiler plate [*sic*] language written by a lackadaisical scrivener." Orphans' Court Opinion, **supra**, at 4. While we agree with the Orphans' Court that the scrivener of the Trust may, indeed, have been lackadaisical, we disagree that the language the court simply chose to disregard was "boilerplate."[4] Rather, as Meter points out, it is key dispositive language

---

different result, because any extrinsic evidence "must be related to the Trust." Orphans' Court Opinion, **supra** at 4. In support of this assertion, the court cited **Blish Trust**, **supra**. In **Blish Trust**, our Supreme Court was tasked with interpreting a trust executed contemporaneously with a will; the case did not involve the admission of extrinsic evidence. Although the Orphans' Court did not provide a pinpoint citation or quote directly from **Blish Trust**, we presume that the court was referring to the following rule of trust interpretation cited therein: "[W]here there are two or more instruments relating to a trust[,] they should be construed together to effectuate settlor's intention[.]" **Blish Trust**, **supra** at 11, citing **In re Kenin's Trust Estate**, 23 A.2d 837 (Pa. 1942). The Orphans' Court appears to have construed this language as limiting the universe of admissible extrinsic evidence only to documents directly related to the document under review, or executed simultaneously therewith. Our reading does not support the Orphans' Court's interpretation. Rather, the cited language merely expands upon the well-settled principle of trust interpretation that "[a] settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution[,] and the circumstances surrounding the execution of the instrument." **Estate of Taylor**, 522 A.2d 641, 643 (Pa. Super. 1987) (construing will and related trust together to ascertain intent of settlor without resort to extrinsic evidence). Accordingly, on remand, the court shall not limit its review of extrinsic evidence to the Settlor's 2015 will.

[4] Blacks' Law Dictionary defines "boilerplate" as "[r]eady-made or all-purpose language that will fit in a variety of documents." Black's Law Dictionary (11th ed. 2019).

"customized to refer specifically to Meter, Jeffrey, and Snyder." Brief of Appellant, at 21. In any event, regardless of how the Settlor's words are characterized, a court may not simply ignore inconvenient language to avoid concluding that a trust is ambiguous. *See McCargo Trust*, *supra* at 1337 (construction that renders any words futile or nugatory must be rejected).

In light of the foregoing, we are constrained to vacate the order granting a declaratory judgment in favor of Snyder and remand this case to the Orphans' Court for further proceedings, in which the court shall receive extrinsic evidence on the issue of Settlor's intent.[5]

Order vacated. Case remanded for further proceedings consistent with the dictates of this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/29/2022

---

[5] Because we have determined that the Trust is ambiguous and that extrinsic evidence is required to ascertain the Settlor's intent, we need not address Meter's remaining appellate claims.